**People of the State of Illinois, Plaintiff-Appellee, v. Jere Price, Defendant-Appellant.**

**Gen. No. 10,915.**

Fourth District.

May 23, 1968.

Rehearing denied and supplemental opinion July 16, 1968.

McGrady & Madden, of Gillespie, and Emerson Baez, of Alton, for appellant.

Thomas P. Carmody, State's Attorney of Macoupin County, of Carlinville, and John W. Russell, Assistant State's Attorney, for appellee.

SMITH, P. J.

The defendant was sentenced to the penitentiary for a period of 2–9 years on a jury's verdict finding him guilty of forcible rape. He seeks a reversal in this court on the ground that his guilt was not established beyond a reasonable doubt. In the alternative, he seeks a new trial on the ground that three of the People's instructions were prejudicially erroneous and deprived him of a fair trial.

Ida Bell Reynolds, the prosecutrix, a married woman, working in Alton, and living with her husband and small children near Wilsonville, left Alton alone in her car about 11:00 p. m. on the night in question. As she drove homeward along a secondary highway known as the Fosterburg Road, a car followed her with its bright lights on, then dimming and finally displaying a flashing red light. She pulled to the side of the road and stopped. The driver came to her car and told her that she had run a speed trap in going through Fosterburg and that the patrolman there had sent him to bring her back so that a ticket could be issued. She got into his car and proceeded back towards Fosterburg. After driving around for some time, the man finally said that he supposed that the patrolman was not coming and he would take her back to her car. Following further aimless driving, he asked her to undress and, on her refusal, he pulled a gun, pointed it at her and said, "I said take off your clothes." When she hesitated, he said, "I'll give you to three" and started counting and clicked the gun. She then stripped. The act of intercourse took place in the front seat of the car and at its conclusion, he directed her to dress. He also told her that he was sorry and asked her forgiveness and told her if she ever told

anybody, he would get rid of her and her family by shooting them. The defendant's automobile was a golden brown with light-cream colored top with the interior, including the seats, a brown trimmed in white. The car had a floor shift and the seats went all the way across. She described her assailant as a rather short man around 5'8"; shorter than that, around 5'6"; had brown hair and rather fat jaws which made his eyes small and squinty; that he was very, very plump with a stomach that almost hung over his belt, and that his hair was short with a rather long crew cut. He had on a pair of Levis, a very large belt with a large buckle, a sports shirt and a lightweight jacket and was very neat. She returned to her car, sobbing, and on reaching her home, she found her husband waiting up for her around 1:15 a. m. Her clothes were all wrinkled up and messy and very wet from the act of rape. He assisted her in cleaning herself and they then went to bed. The following evening they reported the incident to the police officer at Bunker Hill. The sheriff and the State's Attorney's office investigated. She went to Alton, Illinois, to check out a suspect, but that suspect did not turn out to be the person who had attacked her.

Some six months later, the husband and wife were out driving on a road near Alton and she saw a car that resembled the one driven by her assailant, and Mrs. Reynolds identified the occupant when they turned around and came back so she could face him. Her husband testified that she started "shaking and crying" and identified him. She also identified him in court and further stated that when he returned her to the car, he told her that she had better not "tell anybody what happened or that he would get rid of me and my family by shooting us."

Her husband testified and confirmed her testimony as to the post-occurrence events, her description of the car

and the man and the identification. He further testified that when she got home, she jumped out of her car, left the lights on and the door of the car ajar and told him that it was awful, that he threatened her with a gun, and he would kill her if she told anyone and stated that a man raped her. She was crying and sobbing bitterly.

The police officer in Bunker Hill testified that the husband and wife reported to him about 7:00 p. m. the following day and testified that she related to him the circumstances of the occurrence. The details of her story as told to him are substantially the same as those related by her above.

The defendant testified that on the day in question, he did not wear Levis, and did not own any and had never worn any, that he had never had a black belt, had never owned a gun, and didn't own one now. He described the car that he owned in substantially the same fashion as she had. He further testified that on the night in question, he was at his girl's house from about 11:30 and left there about 2 hours later. He testified that her parents came in while they were there. The girl friend testified substantially the same thing, as did her father. The defendant's father and mother testified that he didn't own Levis or a belt with a large buckle.

Another witness testified that on the evening in question the defendant and his girl friend came to the Moonlight Restaurant about 10:00 p. m. and stayed there until about 11:30 and left together. He further testified that the defendant was wearing a sports coat, was neat and well dressed, he had on dress pants and a white shirt and he thought he had on a tie. He didn't remember any one of the 10 to 20 other people there that night.

In rebuttal, the State produced a service station operator who was acquainted with the defendant. He testified that the defendant told him that he belonged to the Jun-

ior Deputies and they talked about a flashing red light. Defendant told him that he used this red light in case of emergencies and would drive out and find spooners at night and when he pulled up on them and turned this red light on them, they would get scared and you would really see them take off. The witness told him he was going to get himself in trouble with it and he just laughed. This witness did not see the red light. Another witness in rebuttal testified that he knew the defendant and talked with him about a pellet gun in the summer of 1965, and that Jere told him he had a pellet pistol. He also testified that the Chevrolet automobile owned by the defendant was a copper bronze. Another witness in rebuttal testified that he had a conversation with the defendant in December and discussed a great big gun with a white handle or bone handle. Defendant said that it was his Dad's or Ed's gun. In surrebuttal, the defendant said that he could not recall saying that he was a Junior Deputy, could not recall any conversation about a red light, did not recall any conversation about his ownership of a pellet pistol, and testified that the conversation about the second gun was a year after the incident in question.

The testimony of the prosecutrix, uncontradicted and not implausible, establishes that a rape was committed. Defendant asks us to remember the venerated observation of Lord Hale years ago that accusation of rape is easily made, difficult to prove, and even more difficult to be defended by an innocent man. It is pointed out that here the issue of force and against her will rests solely in the testimony of the alleged victim. It is urged that it is possible that she was returning from a voluntary and amorous siesta with an unidentified swain and, finding her husband up and awaiting her, fabricated the story of rape to avoid an accusation of infidelity. The Kinsey Reports are cited as some authority for the prop-

osition that in the moral atmosphere of 1966, the cogency of Lord Hale's remarks has greater significance than when they were made. It is further suggested that her identification of the defendant some six months after the incident may well have been prompted by her desire to conclusively establish in her husband's mind that she had not been unfaithful. If these seeds were planted in closing arguments to the jury, they fell on barren ground and never sprouted. The jury, to whom under our system is accorded the evaluation of such inferences, gave them little weight. They have gained neither weight nor substance enroute to this court.

 The principal thrust against proof beyond a reasonable doubt is based on the proposition that a positive alibi established by the defendant and three other witnesses cannot be disregarded where the only evidence contradicting it rests upon the identity of the defendant and where from the entire record there is a reasonable doubt of the guilt of the defendant because of the uncertainty of identification (citing People v. Kidd, 410 Ill 271, 102 NE2d 141). Where such is the case, our Supreme Court has not hesitated to reverse. People v. McGee, 21 Ill2d 440, 173 NE2d 434; People v. Gardner, 35 Ill2d 564, 221 NE2d 232. Neither the rule stated nor the cases cited fit into the factual groove of this case. Defendant's position was effectively repudiated in People v. Wheeler, 5 Ill2d 474, 126 NE2d 228. It was there noted that alibi is an affirmative defense and where the corpus delicti is proved, together with evidence tending to show the guilt of the defendant, the burden of establishing the alibi rests on him even though upon the whole case his guilt must be proved beyond a reasonable doubt. It was further stated that where the identification of a defendant is positive and credible, a guilty verdict may be sustained notwithstanding there may be otherwise uncontradicted alibi evidence and even though the alibi wit-

nesses may be greater in number than those identifying the accused. People v. Renallo, 410 Ill 372, 102 NE2d 116; People v. Lamphear, 6 Ill2d 346, 128 NE2d 892. In People v. Mack, 25 Ill2d 416, 185 NE2d 154, a rape case, the prosecutrix saw the defendant on the streets in Chicago the day after the incident and it was there held that where the disputed testimony is not on the issue of whether the crime was committed, but rather on the identity of the defendant as the person who committed the crime, corroboration is not necessary if the testimony of the prosecutrix is not inconsistent nor does there appear to be any reason for regarding it as unworthy of belief. That rule applies here. In addition, however, we may point out that the red light, the car, and the gun, circumstantial as it is, is nevertheless some corroboration which places the defendant at the scene of the crime. The suggestion that the six-month interval between the incident and her identification would tend to minimize her precise identification, would also impugn the recollection of the alibi witnesses who, unlike the prosecutrix, had no compelling reason to remember that occurrence date or their own whereabouts. There is nothing in this record to suggest that the jury did not properly consider and weigh all of these circumstances. We are not at liberty to substitute our judgment for theirs where the question of credibility and plausibility has been properly considered.

 Criticism is leveled at People's Instruction 11 which was as follows:

"The court instructs the jury that the State is not obligated to produce every witness to a crime and the failure to produce a witness does not give rise to a presumption that the testimony of that witness would be unfavorable to the prosecution."

In the instruction conference, the defendant objected to this instruction stating "no authority for that. I would

like to know what it is. I failed to find any." The State's Attorney replied, "That's included in the model set." This is the sum and substance of the assistance given to the trial court in the conference. The double-barreled attack against this instruction asserts (a) the judge effectively told the jury that a crime had been committed and that was the basic issue in the case and (b) there was a witness to the crime which the State had not produced when in fact there was no such eyewitness. While these criticisms might very well have been obviated by specific objections in the trial court at the conference on instructions, they are, nevertheless, not ipso facto waived under Supreme Court Rule 451, which states that "... substantial defects are not waived by failure to make timely objections thereto if the interests of justice require." Ill Rev Stats 1967, c 110A, § 451. This rule does not remove the necessity for making specific objections to instructions in the conference on instructions in the trial court. Rather it places squarely upon the shoulders of a defendant who seeks to avoid a waiver in the reviewing court the obligation to establish (a) that the defects in the instruction are substantial and (b) that its giving resulted in denying to the defendant justice and a fair trial. People v. Knutson, 17 Ill App2d 251, 149 NE 2d 461, is no barrier to this conclusion for the very simple reason that in that case this issue was neither presented to nor decided by the court (see committee's comments following Rule 451). In civil cases, the lifeblood of an instruction is made up of legal principles supported by evidentiary facts which require instruction by the court for the guidance and direction of the jury in arriving at a proper result. Shore v. Turman, 63 Ill App2d 315, 210 NE2d 232; Turner v. Seyfert, 44 Ill App2d 281, 194 NE2d 529. The State justifies the giving of this instruction on the ground that it would explain why they did not call Dr. Webbe, who did not examine the prosecutrix two days later because she had started her menstrual

95

period or the mother of the prosecutrix, who was not told about the rape because of her nervous condition, or a police sergeant who testified concerning the prosecutrix' refusal to identify a suspect in Alton. These witnesses were not endorsed on the indictment and the subject matter of their testimony related only to facts which would tend to corroborate the statements of the prosecutrix on collateral, incidental and inconsequential matters. None of them were in any sense of the word witnesses "to a crime." While the plea of not guilty placed the fact of rape in technical dispute, there is in this case no evidence contradicting that fact. Indeed the inquiry of the jury in this case and the profile of the issues presented to the jury was not whether in fact a rape was committed, but "whodunit." The occurrence events were factually undisputed and the occurrence events established the corpus delicti. Nevertheless, the argued conclusion that the court was telling this jury that there was another witness available to the State who observed the physical act which constitutes the crime; that said witness need not be called by the State and that failure to call such witness created no presumption that his testimony would be adverse to the State is to unduly denigrate the common sense of the jury. Where, as here, the act of rape was conclusively established by the evidence and its details wholly uncontradicted, we fail to see that the giving of this instruction was so substantially erroneous as to deprive the defendant of a fair trial. The determination of guilt in this case rested not on whether the crime of rape had been committed, but whether or not the defendant participated in it. Errors, defects or irregularities which do not affect substantial rights should be disregarded. Ill Rev Stats 1965, c 38, § 121-9.

People's Instruction 26 reads as follows:

96

"The court instructs the jury that it is not necessary in every rape case that medical testimony be produced. The fact that rape was committed may be proved by testimony, other than medical testimony."

The prosecutrix stated that she had been examined by a doctor two days after the occurrence, but then stated that he didn't examine her because she had begun her menstrual period. The objection to the instruction now raised is that the court was telling the jury that in every case the crime of rape may be established without medical testimony and that this is simply not true. We think this is a strained construction of the language used and it is certainly not clear to us how it in any way prejudiced the defense. The prosecutrix herself negated any evidence of bruises, lacerations or a ruptured hymen. Under the facts in the case the most that a medical examination might have established was through the presence of sperm that sexual intercourse had taken place and this was undisputed. Such testimony would have been consistent with both the theory of the State that a rape had been committed and with the theory of the defense that the prosecutrix was engaged in a volitional pleasurable, nocturnal jaunt of her own. On this record, we are unable to see where this instruction was substantially defective or how in any way it might have misled the jury.

People's Instruction 21 defined reasonable doubt as requiring an "abiding conviction of the truth of the charge." A defendant's instruction advised the jury not to condemn unless the evidence excludes from his mind a reasonable doubt as to the guilt of the accused and "unless he is so convinced by the evidence . . . of the defendant's guilt that as a prudent man he would feel safe to act upon that conviction in the matters of the highest concern and importance to his own dearest per-

sonal interest under circumstances where there was no compulsion resting upon him to act at all." The giving of instructions defining and refining the term "reasonable doubt" has been criticized by the Supreme Court. People v. Davis, 406 Ill 215, 92 NE2d 649. We join in expressing considerable dubiety about the value or the utility of such instructions. They generally degenerate into an endless litany of words less meaningful to the jury than the mere statement that the evidence must establish the defendant's guilt beyond a reasonable doubt. In the instant case, we are of the opinion that this instruction is neither substantial error nor can it be characterized as depriving the defendant of a fair trial.

We, therefore, conclude that there was no reversible error in the trial of this case and that this judgment should be and it is hereby affirmed.

Affirmed.

TRAPP and CRAVEN, JJ., concur.

### Supplemental Opinion on Denial of Petition for Rehearing.

The nature of the Petition for Rehearing suggests the propriety of further comment. The jury was strongly and adequately instructed by the trial court upon the presumption of innocence, the prosecution's burden of proof, that the jury should not single out any particular instruction to the exclusion of others, and that in the giving of any instruction the court was not indicating any opinion as to the facts or the innocence or guilt of the defendant. Indeed in one instruction, the court used the phrase "if any such offense was committed." We further note that defendant's given Instruction No. 15 contained the language "that the defendant was not in the place where the crime was committed, but elsewhere." Defendant's given Instruction No. 13 contains the lan-

98

guage "you have a reasonable doubt that the defendant was present at the scene of the crime and participating in the same when the crime was committed." Two other instructions tendered by the defendant used like or similar language in reference to the crime and were refused by the trial court.

If the seeds of misunderstanding on the part of the jury was engendered by People's Instruction No. 11, it seems abundantly clear that they were fertilized by the defendant's tendered instructions, given instructions and theory of defense. "He was then satisfied that the error alleged was not substantial and did not prejudice his case before the jury. . . ." People v. Keagle, 7 Ill2d 408, 414, 131 NE2d 74, 78.