THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILBUR McCORD, Defendant-Appellant.

First District (2nd Division)   No. 61808

Opinion filed February 15, 1977.

Michael Cohen and Gerald Eisen, both of Niles, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Larry L. Thompson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Defendant, Wilbur McCord, caused Miss Tracy Roberts' death by stabbing her in the back. He was charged by indictment with the offenses of murder and voluntary manslaughter in violation of sections 9—1 and 9—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1971, ch. 38, pars.

9—1, 9—2).[1] Upon a jury trial defendant was found guilty of voluntary manslaughter. Judgment was entered on the verdict and defendant was sentenced to serve a term of confinement of 3 to 9 years in the Illinois State Penitentiary.

From entry of the judgment of conviction defendant appeals and contends (1) that the trial court erred in failing to grant defendant's motion for a directed verdict at the close of all the evidence with respect to the charge of murder; (2) that the trial court erred in tendering to the jury instructions as to both the offense of murder and the lesser included offense of voluntary manslaughter; and (3) that certain comments of the trial court were improper and served to deny defendant a fair trial.

A review of the evidence reveals that at approximately 8 p.m. on Saturday, August 4, 1973, defendant was making a purchase in a liquor store located at 2201 West Madison Street in Chicago, Illinois. To this end, defendant placed $2 on the counter near where Tracy Roberts was standing. Defendant momentarily averted his gaze from the counter during which time his money was removed. The store's cashier informed defendant that Tracy Roberts had taken it.

An argument then ensued between defendant and Tracy Roberts. Defendant demanded the return of his money. Roberts denied having taken it. The dispute was joined by defendant's sister, Jessie Duncan, who told Tracy to return the money to defendant. Duncan and Roberts began to "tussle" and pushed and shoved each other but no blows were struck. Duncan's eyeglasses were knocked off in the scuffle. Defendant interrupted the struggle by separating the two women.

According to a statement rendered by defendant to police officers later that night, defendant left the liquor store and thereafter returned with a "jack handle." Defendant admitted that "she was making me angry so I hit her with the jack handle." Other patrons pulled defendant away from Roberts, ordered him to leave her alone and threatened him with bodily harm if he chose to continue the fracas.

Defendant's aunt, Charlie Bell Parker, upon observing the commotion, entered the liquor store and persuaded defendant to depart with her. At the command of the storekeeper, the group of people moved out of the store and into the street.

According to Parker, Roberts became abusive towards her and

---

[1] On August 5, 1973, a complaint was filed against defendant charging him with the offense of murder. Following a preliminary hearing held on October 4, 1973, defendant was bound over to the grand jury on a charge of voluntary manslaughter. The October 1973 grand jury subsequently indicted defendant for the offenses of murder and voluntary manslaughter.

Prior to trial, the State moved to strike the latter count of the indic ent with leave to reinstate. The motion was granted over defense objection. At the close of all the evidence the jury was tendered, again over defense objection, instructions as to the offense of murder and the lesser included offense of voluntary manslaughter.

announced, "I came to kill or get killed." During this episode, defendant seized the opportunity to go to his home and obtain a butcher knife. Thus armed, according to defendant, "for my own self-protection," defendant returned to the liquor store.

Upon his arrival, he observed Roberts and Parker fighting in the street. At the time of the incident Parker was 58 years of age and afflicted with an arthritic condition of the back, arms and legs. Roberts was 23 years of age, 5 feet, 6 inches tall, and weighed 143 pounds. No testimony as to defendant's stature appears of record.

According to defendant, Roberts was "hot" and "had my auntie by the collar with both hands trying to hit her with the jack handle," apparently resulting in bruises but no lacerations or broken bones. Defendant told Roberts to "cut it out," approached Roberts from the rear, and stabbed her with the knife, thereby inflicting wounds which proved mortal later in the evening. Immediately after the stabbing, however, Roberts was able to walk a short distance from the scene, leaving a trail of blood.

Defendant returned to his home and subsequently told his neighbors, "She is not hurt that bad * * * It wasn't my intention to hurt her that bad * * * I stabbed her with the knife * * * All I wanted her to do was to leave my sister and aunt alone." He obtained an automobile and at the urging of his neighbors left the scene of the incident to "cruise around * * * not thinking of anything happening about this * * *."

Several hours later, upon his return, defendant was observed by Chicago Police Officer William Foster standing in the doorway of his home. As the officer approached, defendant turned and ran into the building, thus exposing to view a knife in his rear pocket. Shortly thereafter, defendant was placed under arrest. Subsequent to defendant's apprehension, police officers recovered the butcher knife from defendant's person, which knife was identified as the one used to stab Roberts. During the course of interrogation that evening, defendant uttered the aforementioned statement in which defendant described the circumstances surrounding his stabbing of Roberts.

Forensic pathologist, Dr. Edward Shlagos, established that the cause of Roberts' death was a knife wound which resulted in "laceration of the lung in a through and through fashion causing major internal bleeding." Post-morten toxicological examination of Roberts' body fluids indicated that on the evening of her death Roberts' blood contained "227 milligrams ethnol [sic]."

The defense offered testimony of defendant's aunt and defendant's other sister, Ernestine Goggins. Goggins testified to Roberts' violent reputation in the community; that the victim was known as a prostitute and lesbian; had "set up" people in the neighborhood to be robbed; and publicly ingested heroin on a daily basis.

Defendant's initial contention is that the trial court erroneously denied defendant's motion for directed verdict of acquittal on the charge of murder. In support of this contention, defendant points out that the evidence is undisputed that defendant came upon his elderly aunt while she was being beaten by the victim with a tire jack; that there was a great and obvious disparity in age between his aunt and the victim; that defendant initially ordered the victim to desist before defendant took violent action. While defendant's aunt testified that Roberts announced prior to the attack that she "came to kill or get killed," there is no indication of record that defendant was aware of these threats. Nor is there specific reference as to the degree of force with which Roberts was striking defendant's aunt, the duration of the attack or the number of blows inflicted by the intoxicated Roberts. Defendant's aunt did not sustain serious or permanent injury.

The State urges in response that the evidence adduced at trial established all the elements required to sustain a guilty verdict of murder and to negate defendant's claims of justification and mitigation so as to justify submission of the case to the jury upon a charge of murder.

■■ When, at the close of the State's evidence or at the close of all the evidence, the evidence is insufficient to support a finding or verdict of guilty the court may and on motion of defendant shall make a finding or direct the jury to return a verdict of not guilty, enter a judgment of acquittal and discharge the defendant. (Ill. Rev. Stat. 1973, ch. 38, par. 115—4(k).) Thus, a directed finding of not guilty is proper when the evidence adduced by the State, when viewed in a manner most favorable to the State, fails to establish defendant's guilt beyond a reasonable doubt. *People v. West* (1973), 13 Ill. App. 3d 550, 300 N.E.2d 808.

Section 9—1 of the Illinois Criminal Code, under which defendant was charged, recites in part that a person is guilty of murder when he performs an act without lawful justification which results in the death of another where he either intends to kill or do great bodily harm to that person, or he knows that such act will cause death to that person or another. Ill. Rev. Stat. 1971, ch. 38, par. 9—1.

■■ In *People v. Carter* (1951), 410 Ill. 462, 466, 102 N.E.2d 312, 314, the Illinois Supreme Court discussed the question of malice and specific intent and noted:

> "The necessary element of malice may be either express or implied, as where the fact has been attended with such circumstances as to evince a plain indication of a reckless heart and mind. [Citations.] There is a presumption that a sane person intends all of the natural and probable consequences flowing from his own deliberate act. [Citation.]"

Furthermore, the intent to take human life may be inferred from the

character of the assault, and such an inference is strengthened by the use of a deadly weapon or other circumstances. (*People v. Muldrow* (1975), 30 Ill. App. 3d 209, 332 N.E.2d 664.) Malice may be implied when all the circumstances surrounding a homicide show an abandoned and malignant heart on the part of the assailant. (*People v. Jones* (1962), 26 Ill. 2d 381, 186 N.E.2d 246.) With respect to the issue of whether the homicide committed by defendant was justified as having been committed in self-defense, it is clear that the question of whether a killing is justified is always a question of fact for the jury, and it is within their province to judge the credibility of the witnesses, weigh the testimony and determine questions of fact. *People v. Benedik* (1974), 56 Ill. 2d 306, 307 N.E.2d 382.

Although regrettably deficient in certain respects, the facts of the case at bar are not in substantial dispute. We note that on the evening of the killing and shortly prior thereto, Roberts and defendant engaged in a violent argument; that defendant extricated himself from the scene on two separate occasions and twice returned armed with weapons capable of inflicting serious injury; that minutes before the stabbing, defendant attacked Roberts, an unarmed woman, with a "jack handle" because she made him "angry" regarding an alleged theft of $2; that during the entire episode the victim was in a highly intoxicated state; that defendant made no attempt to physically separate Roberts and Parker although earlier in the evening defendant had successfully interrupted a struggle between Roberts and Duncan; that defendant uttered only a perfunctory warning to Roberts prior to defendant's use of deadly force to quell the disturbance; and that defendant stabbed Roberts in the back with force directed at and certain to cause great bodily harm to vital organs.

■■ Such evidence simply cannot be ignored. It served to establish a prima facie case of murder and to negate defendant's claims of mitigation and justification. To be sure, a review of the record reveals evidence upon which the jury may have acquitted defendant or convicted him of voluntary manslaughter. However, when such evidence is considered within the entire context of circumstances attending the homicide, reasonable minds could conclude (1) that defendant simply returned to the scene intending to murder or do great bodily harm to Roberts because of her prior transgressions and (2) that Roberts' attack on defendant's aunt was merely coincidental to and not the motivating force behind defendant's actions. Consequently, the trial court was justified in submitting the case to the jury on the charge of murder.

■■ Defendant next contends that certain conduct and remarks of the trial court evidenced "hostility" which thereby prejudiced defendant in the eyes of the jury. Defendant cites three particular instances of alleged misconduct which he maintains warrants reversal of his conviction. In

each instance the trial court commented about the tardiness of defendant in appearing before the court and the delay occasioned thereby; on one occasion kept the jurors waiting in the jury box for the tardy defendant who did not appear until after the jury had been dismissed; and on another occasion ordered defendant to sit in the jury box as "hostage" to insure defense counsel's return to the courtroom in a timely fashion. Several of these comments and actions transpired in the presence of the prospective jurors and those chosen for the panel which ultimately decided defendant's guilt. The trial judge explained that it was his purpose to either inform the jurors as to the reason for delay or to make them feel comfortable by occasional levity.

Such attempts at levity are not to be countenanced or encouraged as necessary to insure or enhance juror relaxation or tranquility. However, review of the record does not indicate that the court's comments, reasonably construed, indicate any opinion as to the facts of the case or defendant's guilt or innocence. The conduct of the trial court does not bespeak prejudice to the defendant. Reversal of defendant's conviction is not mandated by the trial court's actions or comments.

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

DOWNING, P. J., and PERLIN, J., concur.