THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOBE J. SMITH, JR., Defendant-Appellant.

First District (5th Division)    No. 77-248

Opinion filed March 31, 1978.

Theodore M. Becker, of Becker & Tennenbaum, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Joan S. Cherry, and Pamela L. Gray, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Defendant was indicted for murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1) and following a bench trial, was convicted of the lesser included offense of voluntary manslaughter. (Ill. Rev. Stat. 1973, ch. 38, par. 9—2(b).) The trial judge sentenced him to five years probation with one year to be served in periodic imprisonment. On appeal, defendant contends that the State failed to prove him guilty of manslaughter beyond a reasonable doubt.

We affirm.

THE STATE'S CASE

Jean Washington testified that at approximately 9 p.m. on October 4, 1975, she and Julius Jackson were sitting on the steps of the hotel she managed on Rhodes Street. She noticed a blue and white Ford automobile pull up behind a beige and brown automobile that was parked on the east side of the street. After the driver of the blue car parked, an alarm went off. A short time later, a man appeared on the west side of Rhodes, accompanied by a woman whom Washington recognized from the neighborhood, and they proceeded to cross the street. The man walked over to the driver's side of the blue car and five minutes later, Washington heard what sounded like a gunshot. The blue car took off at a high rate of speed, and subsequently the beige car took off in the same direction as the blue car.

During cross-examination, Washington testified that prior to sitting on the steps she had been in her office when her attention was attracted by the sound of tires screeching from the direction of the front of the hotel. When she went outside, she observed a person exit from the beige car and walk to the west side of the street. At that time the blue car was not in sight. After the blue car appeared, Washington did not observe anyone leave that car, nor did she notice any of the doors of the car open. She further stated that she did not see who did the shooting nor who was shot. Although she noticed that the alarm had stopped sounding, she did not see anyone turn it off, nor was she sure from which car the sound had been emanating. However at the preliminary hearing, she had testified that the driver of the beige car cut off the alarm on his car.

Jearlean Smith, the common-law wife of Oswald Smith (Oswald), stated that on October 4, 1975, at 9 p.m. she and her husband parked their white-over-blue Ford automobile on the east side of Rhodes. While Oswald was parking, he lightly bumped the yellow car in front of them and set off that car's burglar alarm. A man, later identified as defendant, exited from a doorway across the street. He proceeded to cross the street, walk over to his car and turn off his burglar alarm. Defendant then walked over to the driver's side of Oswald's car and asked him through the half-opened window and in a raised tone of voice whether he had bumped his car. Oswald answered, in a normal tone, that defendant's burglary alarm was set too "tight."

Jearlean then decided to leave the car and on the way to her apartment nearby, she heard the voices of people sitting on a porch. Just before she opened the door to her apartment, she heard a shot. She entered her home and a few minutes later, her phone rang. After she answered the phone, she ran outside and noticed that a green car which she later learned belonged to Mildred Barnett was parked where Oswald had been parked. Jearlean then took a taxi to 61st and Cottage Grove, where an accident had occurred and Oswald was being carried to an ambulance.

During cross-examination, Jearlean testified that her husband had not had anything to drink that evening. When asked how much time elapsed between the shot and the ringing of the telephone, Jearlean's answers varied from 1 to 10 minutes. She further denied stating at the preliminary hearing that she heard the phone ringing before she entered and that made her "want to get in the house faster." She also denied testifying before the grand jury that Oswald left his car to turn off his burglar alarm.

Chicago police officer John Merriweather testified that defendant, whom he had known for about a year, came to his home on October 5, 1975. Defendant told him that on the previous evening, someone had bumped defendant's car and that when he went to talk to this individual, the latter made a hostile or threatening motion. Defendant further admitted that he shot his gun in the direction of the man and that he was willing to surrender himself to the police. Defendant stated that he destroyed the gun he used. Merriweather told him that he would call headquarters and find out what happened.

Julius Jackson stated that between 8-9 p.m. on October 4, 1975, he was sitting on the steps of the hotel on Rhodes where he was employed as a janitor. Jean Washington, the manager, was standing on the porch. He heard the sound of a burglar alarm, and then observed a man and a woman, both of whom he had previously seen in the neighborhood, crossing from the west to the east side of the street. The man walked over to a beige Oldsmobile, turned off the alarm and then walked over near the driver's side of the blue car parked directly behind the beige car. The

woman, later identified as Mildred Barnett, was standing directly behind the man, later identified as defendant. The driver's window of the blue car was opened. Jackson heard voices but could not discern any words or tones of voice. He did not notice whether the man behind the wheel of the blue car moved. A few seconds later, Jackson heard what sounded like a shot and the man in the blue car then took off at a high rate of speed. Defendant walked over to his car, carrying in his hand what appeared to be a shiny object. He put the object in his pocket, got into his car and drove away. Barnett then moved her green and white Oldsmobile from the west to the east side of the street and entered a building.

During cross-examination, Jackson stated that the alarm he was referring to on direct, was the second one he had heard that evening. The second alarm sounded approximately 10 minutes after the first had been turned off. He did not know whether the two separate sirens had originated from the same car. Jackson also testified that he could not see what the man in the blue car had been doing, nor did he observe the blue car bump the beige car.

The parties then stipulated to the facts contained in the coroner's "pathological report and protocol" which revealed that Oswald Smith was 6 feet 3 inches, weighed 252 pounds and died from a bullet wound which entered his lower neck. They further stipulated that if Allen Turner were called to testify, he would say that he heard a shot while he was on the corner of 61st and Rhodes. A man, later identified as Oswald Smith, stopped his car and said "I am shot. Somebody take me to the hospital." Turner got into Oswald's car and proceeded to drive in the direction of a hospital. A short time later, Turner became involved in an accident with another vehicle. He jumped out of the car, ran to the hospital and arranged to have an ambulance sent to pick up Oswald.

Officer Dennis Kieltyka testified during cross-examination that at the scene of the accident, he searched Oswald's vehicle and found that there were two screwdrivers, one in the front, and one in the back of the car. He also observed a wrench and a beer can on the floor of the automobile.

Before the State rested, another stipulation was entered that defendant surrendered himself to Investigator Ellison on October 7, 1975.

### DEFENDANT'S CASE

The testimony of Mildred Barnett and defendant was substantially similar: At approximately 8:30 p.m. on October 4, 1975, defendant was visiting Barnett in her apartment on Rhodes when they heard a burglar alarm sounding outside. Defendant went downstairs to check his car and Barnett looked out her front room window. She observed a man and a woman sitting in a blue and white Ford parked behind defendant's beige Oldsmobile. Defendant turned off the alarm on his car and went over to

talk to the man, later identified as Oswald Smith, through the window on the driver's side. Oswald told him that his alarm was too sensitive and the woman exited from the passenger's side and proceeded in a southerly direction towards the alley. After talking with Oswald, defendant went back upstairs. Two minutes later, an alarm sounded again. Barnett and defendant went downstairs and saw that Oswald was sitting on a basement window ledge directly in front of his own car. The sound of the alarm was emanating from Oswald's car. Barnett and defendant turned to go upstairs and the alarm stopped. They returned to her apartment, and another alarm began to sound. They returned downstairs and shut off the alarm on defendant's car. She did not see Oswald or his car at this time. Defendant then said he would back up Barnett's automobile and move his car across the street and park in front of hers. They subsequently crossed the street, and as they reached her car, Oswald drove his car around the corner, parked in the space behind defendant's car, and set off his alarm again. Defendant turned off his alarm and he and Barnett walked over to Oswald, who was seated in his car. Defendant asked him what was wrong with him and Oswald began swearing at defendant. Defendant then reparked his own car to demonstrate how a car could be parked without setting off an alarm. Defendant got out of his car and Oswald again bumped his car. Defendant walked over to Oswald's window and the latter held up a long shiny object, which looked like a screwdriver, opened his car door about 14 inches, and threatened to stab defendant in the heart. Defendant stepped back and fired his gun once in the general direction of Oswald. Oswald shut his car door and drove away.

Defendant testified that his gun was registered and that he had been carrying it that entire afternoon. Defendant also stated that he was 5 feet 7½ inches and weighed 150 pounds while the deceased was about 6 feet 2 inches and appeared to weigh 300 pounds. He was afraid that Oswald was going to kill him.

During the State's case in rebuttal, Merriweather stated that defendant never told him that he saw an object in the deceased's hand. After closing arguments, the judge found defendant guilty of voluntary manslaughter and sentenced him to 5 years probation with 1 year periodic imprisonment.

Opinion

The sole issue on this appeal is whether the State proved defendant guilty of voluntary manslaughter beyond a reasonable doubt. Concomitant with this issue, we must decide whether the State met its burden of proof in showing that defendant was not acting in self-defense when he shot Oswald Smith.

Section 9—2(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 9—2(b)) provides:

"A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code [Ill. Rev. Stat. 1973, ch. 38, par. 7—1 *et seq.*], but his belief is unreasonable."

Section 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 7—1) provides in part:

"[A person] is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another * * *."

■■ Thus, in order to resolve whether a killing was justified under self-defense principles, or whether it was not justified amounting to voluntary manslaughter, the question becomes whether defendant's belief that he had to use deadly force was reasonable under the circumstances. (*People v. Pickett* (1976), 35 Ill. App. 3d 909, 342 N.E.2d 766.) This is a question to be determined by the trier of fact and his finding will not be set aside on review unless the evidence is so unsatisfactory as to leave a reasonable doubt of defendant's guilt. *People v. Lenzi* (1976), 41 Ill. App. 3d 825, 355 N.E.2d 153; *People v. Pearson* (1976), 40 Ill. App. 3d 315, 352 N.E.2d 240; *People v. Echoles* (1976), 36 Ill. App. 3d 845, 344 N.E.2d 620; *People v. Harling* (1975), 29 Ill. App. 3d 1053, 331 N.E.2d 653.

Once a defendant affirmatively raises the issue of self-defense, it is then incumbent upon the State to prove beyond a reasonable doubt, that defendant was not acting in self-defense as well as all other elements of the offense. (Ill. Rev. Stat. 1973, ch. 38, par. 7—14; *People v. Harling* (1975), 29 Ill. App. 3d 1053, 331 N.E.2d 653.) Defendant contends that the State failed to meet its burden of proof in the instant case. We disagree.

After reviewing the evidence, we find that there are only a few important factors which distinguish the defense's version of what transpired from the State's. They are (1) defendant observed a screwdriver in the deceased's hand, (2) defendant and Mrs. Barnett heard Oswald threaten defendant, (3) defendant and Barnett testified that the deceased opened his car door 14 inches, presumably to carry out the threat, (4) defendant was fearful for his life given the above factors and the rather large size of the deceased.

■■ While the State's eyewitnesses could not directly rebut this testimony due to their vantage point, we believe that given the evidence before him, the trial judge could have nevertheless concluded that

defendant's actions were unreasonable under the circumstances. Neither the deceased's large size nor verbal threats, without more, could have justified the extreme action taken by defendant. (*People v. Pearson* (1976), 40 Ill. App. 3d 315, 352 N.E.2d 240.) Even assuming that defendant observed a weapon in the deceased's hand and saw the car door open about 14 inches, defendant paused only at most, a few seconds before he used deadly force against Oswald. Furthermore, given the large size of the deceased, it is doubtful that he could have acted quickly enough to carry out his threat. Defendant himself admitted that the deceased was still in the car when he fired the shot, and none of the State's witnesses ever observed a car door open during the sequence of events. There was ample evidence from which the trial judge could have determined that defendant's belief that he had to use deadly force against Oswald was unreasonable.

Defendant contends that his conviction for manslaughter and the relatively light sentence imposed suggests that the trial judge compromised rather than acquitting him or alterntively finding him guilty of murder. This argument has been squarely met by the court in *People v. Morgan* (1969), 114 Ill. App. 2d 421, 426-27, 252 N.E.2d 730, 733:

> "The contention of the defendant that the finding of guilty of voluntary manslaughter where he had introduced evidence of self-defense constitutes a compromise is untenable. This argument assumes that whenever a person believes that deadly force is necessary to protect himself from death or great bodily harm his belief must be reasonable. If that proposition were correct a factual situation could not arise where section (b) of the statute [Ill. Rev. Stat. 1973, ch. 38, par. 9—2(b)] would be applicable." See also *People v. Young* (1973), 11 Ill. App. 3d 609, 297 N.E.2d 298.

■■ We finally mention that it has been established that a defendant cannot complain of a conviction for manslaughter where the record discloses evidence sufficient to sustain a conviction for murder. (*People v. Schwartz* (1974), 58 Ill. 2d 274, 319 N.E.2d 23; *People v. Young* (1973), 11 Ill. App. 3d 609, 297 N.E.2d 298.) The conviction for the lesser included charge will not be disturbed on review unless the finding is palpably contrary to the evidence. *People v. Horton* (1975), 29 Ill. App. 3d 704, 331 N.E.2d 104; *People v. Dillon* (1975), 28 Ill. App. 3d 11, 327 N.E.2d 225.

For the foregoing reasons, we affirm defendant's conviction for voluntary manslaughter.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.