THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIE MILTON, Defendant-Appellant.

First District (4th Division) No. 76-1148

Opinion filed May 24, 1979.

LINN, J., dissenting.

Julius Lucius Echeles, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Pamela Louise Gray, and Ira H. Raphaelson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Defendant Willie Milton was indicted on two counts for the murder of Freddie Johnson, two counts for the battery of Johnny Wilson, and one count for the attempt murder of Johnny Wilson. After a jury trial defendant was found guilty of the voluntary manslaughter charge of Johnson and the aggravated battery of Wilson. He was sentenced to 6 to 18 years and fined $4,000 on the voluntary manslaughter conviction and was sentenced to a concurrent term of 3 to 9 years and fined $1,000 on the aggravated battery conviction. On appeal defendant seeks reversal of his voluntary manslaughter conviction based on four contentions: (1) the evidence does not sustain a conviction for voluntary manslaughter; (2) the jury should not have received any instructions on voluntary manslaughter; (3) the jury was not properly instructed on justifiable use of force; (4) the trial court improperly prevented defendant from impeaching a crucial prosecution witness with prior conflicting statements. The third and fourth contentions are also urged by defendant in seeking reversal of his conviction for aggravated battery.

We reverse defendant's convictions and remand for a new trial.

The issues raised on appeal necessitate a summary of the relevant testimony. Three eyewitnesses testified for the State, Eugene Knox, Walter Davis, and Johnny Wilson. Knox was the owner of a hardware store at 628 South Pulaski in Chicago. On October 6, 1974, Knox was in the store after hours with defendant, Johnny Wilson, Freddie Johnson, Davis, and two or three others. They had been gambling with cards and drinking beer, though no one was drunk. Between 8 and 9 p.m., when Knox was in the back of his store, he heard two shots. He went to the front of the store and saw defendant standing with a gun in his hand. Wilson, who was sitting on a counter, said something to defendant which Knox could not hear. Defendant said, "Pal, you must want some too" and shot Wilson, who fell over the back side of the counter. Knox moved closer to the front door and asked defendant not to shoot him. As he approached he saw Freddie Johnson lying on the floor. At that time a police officer entered. At no time that day did Knox see a weapon in the possession of Wilson or Johnson. The defendant did not come into the store with a woman that day, nor did Knox recall hearing Johnson make an offensive remark to a woman accompanying the defendant.

Walter Davis testified he went to the store between 7 and 7:30 in the evening. In the back room were Knox, the defendant, Freddie Johnson, and a number of others, including one woman. When Davis arrived a dice game started. There was no drinking while he was there. About 8:30 or 9 the game broke up because defendant had won and the others were broke. Everyone began to leave when defendant and Freddie Johnson, who were three feet apart, started to argue. Johnson swore at defendant and

told him not to come back on the corner. Defendant asked if this was a threat. Johnson again swore at the defendant and repeated that he should not come back to that corner. Defendant struck Johnson with his hand and Johnson kept swearing at him. At this point there was gunfire and Davis saw that defendant had the gun in his hand. He never saw a gun in Johnson's hand, nor did he see Johnson strike defendant. Knox ran up from the rear of the store, telling defendant not to shoot him. Johnny Wilson had been three or four feet from the defendant, but when the gunfire started he moved against a counter. From there Wilson, who had nothing in his hands, told defendant not to shoot Johnson again. Defendant asked Wilson if he wanted "some of it" and then Davis again heard gunfire. Wilson was hit and fell behind the counter. Davis did not know if anyone complained to the defendant about losing money; nor did he see anyone put their hands in defendant's pockets.

Johnny Wilson related he arrived at the store about 7:30 p.m. He had been playing pool nearby with a friend and had one alcoholic drink there. He went to the back office where Knox, Davis, Johnson and some others were present. They were talking when defendant came in. No gambling or drinking took place while Wilson was there. Some joking and teasing went on about a young lady who was with the defendant. Johnson then told defendant if he was afraid for the woman he should have left her in the car. Defendant responded that he did not have to take her to the car. Johnson said he should have if he was afraid someone was going to take her. This conversation began as everyone was leaving the office. The woman left the store. In the main part of the store defendant pulled a pistol and put it to Johnson's head, saying that he did not have to leave the woman outside. He took the gun away from Johnson's head and Johnson told him he should not play that way. Defendant pulled the gun back out of his belt and slapped Johnson. Johnson told him he might as well shoot him if he was going to slap him and pull the pistol on him. Defendant responded that he did not have to shoot him and Johnson said he might as well. Defendant said "If that is what you want, pal" and shot Johnson three times. Wilson never saw Johnson with a weapon nor was he himself armed. After the shooting Wilson asked defendant why he had done that. Defendant said "You want some too, pal" and shot Wilson, who fell behind the counter on which he had been sitting. He heard Knox pleading not to be shot and then the police arrived. Wilson testified that defendant's slacks were not ripped and neither he nor Johnson ever touched the defendant.

The pathologist who examined Johnson's body determined that two bullets struck him, one behind the ear and the other in front, about three inches above the belt. The bullet wound to the head was the cause of death.

Testifying for defendant were two eyewitnesses, Marshall Sprawls, Alex Beverly, and the defendant himself. Marshall Sprawls testified he arrived at the store about 6 p.m. He placed a gun he had in Knox's drawer, then went to the office in the rear, where people were gambling with dice. Sprawls did not drink, but others were drinking and Knox, Johnson and Wilson were drunk. Willie Milton arrived with a young woman about 6:20 and gambling continued until 8:30. Sprawls won $500 and defendant won even more than that. Freddie Johnson kept swearing at defendant and asking him for money, but defendant refused. When the game broke up Sprawls left to collect some money. When he returned defendant and Johnson were in the main part of the store, arguing, and Wilson was sitting on the counter. Johnson said "Give me that money, you m_____-f_____." Defendant told him to leave him alone. Then Sprawls heard defendant say, "Get out of my pocket." The defendant and Johnson were close together at this point; Johnson reached behind his back, where he had a gun, and shooting started. Wilson jumped off the counter and got into a "tussle" with defendant and Johnson. Sprawls hid behind the counter. He heard a total of three shots; after the third shot Wilson came back over the counter. Sprawls ran and was detained by the police.

Alex Beverly arrived at the store between 4 and 4:30, going into the back office to join Wilson, Johnson, the defendant, and a fourth man. Gambling with dice was going on and Beverly participated for about an hour and a half. During this time defendant and Johnson argued about the fact that Johnson kept picking up the money. Beverly left around 5:30 and returned at about 8:30. He heard Johnson ask defendant for money, a request defendant refused. Johnson and defendant began swearing at each other. Wilson, who was sitting on the counter, said "Go ahead get [*sic*] you some of that money." Defendant began to walk to the door, but Johnson said he would kill him if he left because he would not give him any money. Defendant turned from the door and Johnson swore at him and again demanded money. Defendant refused and said he (defendant) would have more respect for Johnson's lady. He then asked the lady to leave the premises and she complied. When defendant again started for the door Johnson asked him not to leave, also saying "If I don't kill you here, I'm going to kill you on the streets." Defendant turned back and asked Johnson why he was threatening him. Defendant told Johnson he did not have to give him his money. Wilson then told Johnson to go ahead and get some money. Johnson, swearing at defendant and saying defendant was going to give him money, reached behind his back, pushing his jacket aside. Wilson came off the counter and he and Johnson began struggling with the defendant. During the struggle defendant yelled "Get out of my pocket." Beverly heard three shots but did not see what happened because he ran out the door, where he was met by the

police. Beverly denied drinking while at the store. He also testified that he never saw a gun in anyone's hand that night.

Defendant testified that he arrived at the store about noon. He, Johnson, Knox and some others played cards till about 3. Later a dice game began. During the dice game Johnson argued with defendant about his (Johnson's) right to hold the money. Johnson was not playing but he swore at defendant and asserted his right to hold the money. At 5:30 defendant left, returning in about 40 minutes with a woman friend. They went into the back office were defendant joined a dice game in progress. Defendant and Sprawls were the winners in the game and defendant quit at about 8:30 with $625. He began to walk out of the store but Johnson followed, cursing him and demanding money. Defendant refused and Johnson told him if he did not let him have it defendant was not going to live to get out of the store. Defendant indicated his intention to live and Johnson again swore at him and demanded money. Defendant refused, stating he did not owe him any. When defendant refused another demand for money Johnson approached to within two feet and reached under his coat. Defendant grabbed Johnson's hands. Wilson ran over and reached into defendant's left pants pocket. The pocket and pants seam were torn down to defendant's knee. As they wrestled, with defendant trying to hold on to his money, a gun discharged three times. Johnson slumped to the floor and Wilson fell behind the counter. Defendant had not see a gun but he had felt one in Johnson's hand. The police entered and picked the gun off the floor. Defendant denied having anything to drink that night.

Defendant had also testified that he wore his pants in their torn condition for several days in jail following his arrest. To rebut this testimony the State elicited the testimony of Officer Edward Triggs who saw the defendant at the police station on the day of the shooting and noticed nothing unusual about his left pants pocket and seam.

I.

 Contrary to defendant's contention, we find that this record amply supports a finding that defendant committed voluntary manslaughter. The jury was instructed on two alternate theories of voluntary manslaughter: killing while acting under a sudden and intense passion resulting from serious provocation (Ill. Rev. Stat. 1975, ch. 38, par. 9—2(a)), and killing in the unreasonable belief that circumstances justify the act. (Ill. Rev. Stat. 1975, ch. 38, par. 9—2(b).) There was evidence presented that defendant and the deceased had quarreled earlier in the day and that just before the shooting an argument began again. The deceased repeatedly swore at the defendant and, according to the testimony of Beverly and Sprawls, the two began fighting. Evidence that

a defendant who killed an individual was acting under a sudden and intense passion caused by a violent struggle with that person has been held sufficient to support a finding of voluntary manslaughter. (*People v. Goolsby* (1977), 45 Ill. App. 3d 441, 359 N.E.2d 871.) Alternatively, defendant's own testimony tended to establish that he believed his life was in danger and that the deceased and Johnson were attempting to rob him. The jury may have believed defendant's testimony to this exent but they may have determined that his fears were unreasonable under the circumstances. Where the trier of fact finds that a defendant killed another in the unreasonable belief that deadly force was necessary to protect himself, a finding of voluntary manslaughter is justified. (*People v. Smith* (1978), 58 Ill. App. 3d 784, 374 N.E.2d 1285.) It is not our function on review to substitute our determination of these matters for those of the jury as the trier of fact where, as in this case, that determination is supported by the evidence. *People v. McCord* (1977), 46 Ill. App. 3d 389, 361 N.E.2d 13; *People v. Davis* (1975), 33 Ill. App. 3d 105, 337 N.E.2d 256.

## II.

Defendant also asserts it was error to instruct the jury on both theories of manslaughter, citing cases indicating that a defense of deliberate self-defense negates an inference of sudden and intense passion. (*People v. Parker* (1976), 40 Ill. App. 3d 597, 352 N.E.2d 394; *People v. Clark* (1973), 15 Ill. App. 3d 756, 305 N.E.2d 218.) But those cases are inapposite. In *Parker* defendant's evidence supported only a theory of self-defense, while the State's evidence clearly showed an unprovoked attack by him. The court found no evidence to support defendant's proposed instruction on sudden and intense passion and consequently found no error in the trial court's rejection of it. In *Clark* the defendant was charged with murder but convicted of voluntary manslaughter under the sudden and intense passion theory. The reviewing court found no evidence of such passion, noting that defendant's claim of self-defense also tended to negate an inference of sudden and intense passion. Because the State had rebutted defendant's claim of self-defense, neither theory of voluntary manslaughter was established and defendant's conviction was reversed. No jury instructions were at issue because the cause had been tried before a judge. In the case at bar we have noted that evidence offered by the defendant himself tended to support a finding that he acted in the unreasonable belief that he had to defend himself; on the other hand the testimony of two other defense witnesses could have been found to establish that defendant was provoked and was acting under a sudden and intense passion. Whether either form of the crime was committed depended on the jury's resolution

of the facts. Accordingly the trial judge did not err in instructing the jury on both theories despite defendant's objections to those instructions. *People v. Vega* (1973), 16 Ill. App. 3d 504, 306 N.E.2d 718; see *People v. Taylor* (1967), 36 Ill. 2d 483, 224 N.E.2d 266.

## III.

However defendant also complains of the trial court's failure to fully instruct the jury on justifiable use of force. The State submitted the following instruction:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

This is the IPI instruction on use of force in defense of person (Illinois Pattern Jury Instructions, Criminal, No. 24.06 (1968)), except that it omits the provision that deadly force may also be used to prevent the commission of a forcible felony.

There was evidence presented at trial that defendant had just won a substantial amount of cash. The deceased repeatedly demanded some of this money, then reached for a gun and was joined by Wilson in a struggle with defendant. During the struggle Wilson reached into defendant's pocket, while defendant attempted to hold on to his money. The jury may have believed that this evidence established that defendant was resisting a robbery but used deadly force in doing so. Although this finding would have mandated an acquittal under Illinois law (Ill. Rev. Stat. 1975, ch. 38, par. 7—1), the instruction to the jury did not permit such a result unless they also found that defendant was reasonably in fear of death or great bodily harm. The jury, in effect, was incorrectly instructed on the extent of the defense of justifiable use of force. This was reversible error. *People v. Wright* (1974), 24 Ill. App. 3d 536, 321 N.E.2d 52; *People v. Bailey* (1973), 15 Ill. App. 3d 558, 304 N.E.2d 668.

The State contends that defendant has waived any error because his objection to this instruction at trial did not relate to the failure to include language about preventing forcible felonies. Defendant sought only to exclude the entire second paragraph of the instruction, contending that it constituted improper comment on the evidence. However, under Supreme Court Rule 451(c) (Ill. Rev. Stat. 1975, ch. 110A, par. 451(c)), substantial defects in instructions are not waived by failure to make timely objections if the interests of justice require consideration of the error. In such instances a defendant must show that the defect is

substantial and had the effect of denying him a fair trial. (*People v. Price* (1968), 96 Ill. App. 2d 86, 238 N.E.2d 881.) That test is met in this case where the result of the improper instruction was to create the distinct possibility that defendant was convicted of two crimes despite a jury finding which should have required his acquittal. Accordingly defendant's convictions should be reversed on this basis alone.

## IV.

But our decision to reverse and remand this cause is supported on a second independent basis. That is the court's exclusion of evidence which impeached a State witness, Eugene Knox, on the heart of his testimony. Defendant answered the State's discovery motion on June 15, 1976, furnishing them with the transcript of an oral statement made by Knox. In that statement Knox said, *inter alia,* that he was "half lit" on the day of the shooting and he never saw the defendant with a gun. Defense counsel indicated that the statement was made approximately three weeks earlier in defense attorney Gerald Bender's office and had been tape recorded with the knowledge of Knox. Bender also indicated that the tape had been reused, destroying the recording of Knox's statement. *Voir dire* commenced the same day the statement was furnished to the State and jury selection was completed the following day, June 16.

On cross-examination at trial Knox denied being in Bender's office on June 12, 1976, in July 1975, or at any other time. He also denied that Bender ever asked him questions while recording the conversation, and generally denied ever talking to Bender. Defense counsel Julius Sherwin then made an offer of proof that on June 12 at about 1:30 p.m. he was in Bender's office with Bender, defendant, Sprawls, and Knox. At that time Knox admitted having spoken to Bender previously in his office. Knox also admitted that the questions and answers in the transcript were accurate. Bender again indicated that he did not have the tape recording. Cross-examination resumed and Knox denied ever stating to Sherwin or Bender that he was "half-lit" or that he did not see the defendant with a gun. He also denied that Sherwin ever read questions and answers to him from a transcript, or that he ever met with either man.

Following the direct examination of Johnny Wilson by the State there was a conference between the trial attorneys and the judge. The State indicated that the day before, June 17, defense counsel informed them they did have the recording of Knox. Later on the afternoon of the 18th the defense produced the tape and played it in chambers. Attorney Bender stated that he had believed the recording was taped over, but he discovered it still existed when he reviewed all of his tapes. The defense then indicated that the recording was made in June 1975. Bender explained that when he said the *statement* was taken three weeks before he was not referring to the tape, but just to the statement, apparently a

reference to *transcription* of the tape. The State moved to exclude from evidence any mention of the conversation between Bender and Knox for failure to comply with discovery; specifically, the State complained that they were misled as to the date the recording was made and that defendant failed to produce the actual tape until after trial began. The defense argued that the State was not prejudiced, as they were given the transcript prior to trial and were still not precluded from subjecting the tape to scientific testing. The court barred any further reference to the statement, but did permit defendant to elicit from Marshall Sprawls the testimony that he and Knox were in Bender's office on June 12, 1976. At the close of all the evidence the court granted the State's motion to strike all questions and answers concerning the interrogation of Knox by Bender. The jury was instructed that:

> "* * * all references to an interview between Attorney Bender and the Witness Knox is [*sic*] stricken from the record and you are to disregard all references to that interview."

There is some question whether defendant did in fact fail to comply with discovery. The State was informed, prior to trial, as part of the answer to discovery, that the recording had been made and they were furnished at that time with a full transcript.[1] Nothing in the record refutes defense counsel's claim of genuine mistake as to whether the recording had been erased. When the defense did discover the recording still existed they fulfilled their continuing obligation to comply with discovery by producing the tape for the court and for the State. The remaining basis of the alleged failure to comply was that the State was misled as to the date the tape was made. But again the State does not directly challenge defense counsel's explanation of confusion between the date of transcription and the date of recording. The State was fully informed of the contents of the statement prior to trial and when the actual recording was discovered this too was provided, along with a clarification of when the recording was made.

■■ But even if defense counsel's lack of diligence in uncovering the tape and the failure to clearly indicate when it was made were held to constitute a failure to fully comply with discovery, exclusion of the statement would not be the sole remedy. Under Supreme Court Rule 415(g) (Ill. Rev. Stat. 1975, ch. 110A, par. 415(g)), less severe measures are also permitted: full disclosure of the material, granting a continuance to cure any prejudice, or directing the sanction at the attorney. (*People v. Williams* (1977), 55 Ill. App. 3d 752, 370 N.E.2d 1261.) The rule does give the trial judge discretion to exclude the evidence involved, but this is a harsh sanction which, if used indiscriminately, may prejudice the rights of a defendant and constitute reversible error. (*People v. Lane* (1979),

---

[1] At trial the State agreed with the trial court that the transcript was "substantially correct."

71 Ill. App. 3d 576, 390 N.E.2d 82; *People v. Rayford* (1976), 43 Ill. App. 3d 283, 356 N.E.2d 1274.) The cases cited by the State, in which this extreme measure was approved on review, are not analogous to the facts of this case. In *People v. Warren* (1975), 32 Ill. App. 3d 218, 336 N.E.2d 557, the defendant gave no indication at trial or on appeal what the excluded testimony would have been. Under those circumstances the reviewing court could find no abuse of discretion. And in *People v. Douthit* (1977), 51 Ill. App. 3d 751, 366 N.E.2d 950, the reviewing court expressly noted that they placed little credence in defense counsel's explanations of his failure to respond to discovery until two days into trial. The court found that this may have been a tactical maneuver aimed at surprise. In this cause no tactical advantage was possible, for the State was informed of the contents of the statement before trial. Nor do we find in this record evidence of deliberate deception by trial counsel.

■■ As we have noted, the defense expressed a willingness to allow the State time to test the recording when it was furnished. The State has not contested the origin of the tape, but assuming a wish to do so, a continuance for that purpose would have cured any possible prejudice arising from the late production of the tape. The case is similar in this respect to *People v. Jackson* (1977), 48 Ill. App. 3d 769, 363 N.E.2d 392, where the exclusion sanction was held excessive although defendant had not listed the excluded witnesses. The reviewing court noted that any possible prejudice could have been cured by allowing a recess to permit the State to interview the witnesses. The court also relied in part on a presumption that the State had knowledge of the witnesses, who were prisoners. In this cause no such presumption is necessary, as the State had actual knowledge of the entire statement in question before trial. In *People v. Hahn* (1976), 39 Ill. App. 3d 969, 350 N.E.2d 839, exclusion of a witness was held to be excessive despite the failure to list him in discovery, the reviewing court noting that any surprise could have been cured by granting a continuance. And again in *People v. De Leon* (1976), 40 Ill. App. 3d 308, 352 N.E.2d 234, the State was presumed to be aware of the nature of the testimony of an unlisted defense witness because he was on the State's list of witnesses. Consequently, exclusion of his testimony was found to be an abuse of discretion. In this cause, where the State was provided a transcript of the excluded evidence before trial and where any possible prejudice arising from the late discovery of the actual recording could have been cured by allowing the State time to examine and test it, we find that exclusion of that evidence and any reference to it was an abuse of discretion.

In *Hahn* no reversible error was found because the court could not determine the exact nature of the excluded testimony; in *De Leon* the

court found no prejudice because the evidence related to a charge of which the defendant was acquitted. But the resulting prejudice in this case is clear. The jury evidently did not believe the testimony of Johnny Wilson, for that version of the events would have resulted in a murder conviction. And although Walter Davis did not claim to have seen the shots fired, his testimony corroborated that of Wilson and thus was apparently also disbelieved by the jury. The only remaining witness who claimed to have seen a gun in defendant's hand was Knox. Had the defendant been permitted to impeach this witness with his prior contradictory statement on this very point, the jury might have placed more credence in the whole of defendant's testimony. The exclusion of this potentially crucial impeaching evidence manifestly prejudiced defendant and requires that his convictions be reversed and the cause remanded for a new trial.

For the foregoing reasons, the judgment of the trial court is reversed and the cause remanded for further proceedings in conformity with this opinion.

Reversed and remanded.

JOHNSON, J., concurs.

Mr. JUSTICE LINN, dissenting:

I respectfully dissent from the majority's conclusion that trial error requires reversal of this case for a new trial. In light of the overwhelming evidence of defendant's guilt, neither error cited as grounds for reversal is of such a substantial nature as to deny defendant a fair trial.

I disagree that the alleged defect in the instruction on the justifiable use of force is cause for reversal. The majority concedes that defendant did not preserve his specific objection to this instruction at trial, but considers the issue under Supreme Court Rule 451(c). (Ill. Rev. Stat. 1975, ch. 110A, par. 451(c).) Failure to object to an instruction at the trial court level ordinarily operates as a waiver of any such objection on appeal. (*People v. Mallett* (1970), 45 Ill. 2d 388, 259 N.E.2d 241.) Supreme Court Rule 451(c) permits an exception to the rule by providing that substantial defects are not waived by failure to make timely objections if the interests of justice so require. (See *People v. Robinson* (1974), 21 Ill. App. 3d 343, 315 N.E.2d 95.) However, to avoid waiver for failure to make an objection, defendant must establish that the defect in the instruction is substantial, and that the giving of the instruction resulted in a denial of a fair trial and justice. *People v. Knox* (1969), 116 Ill. App. 2d 427, 252 N.E.2d 549; *People v. Price* (1968), 96 Ill. App. 2d 86, 238 N.E.2d 881.

Under the circumstances of the present case, the giving of the

instruction in question did not deny defendant a fair trial. The unrebutted evidence indicates that the shooting incident arose from an argument at the conclusion of a dice game. The State's witnesses testified that defendant pulled a gun during the argument. Under defendant's theory of the case, Freddie Johnson threatened defendant with the weapon in an attempt to recover his gambling losses. Even if defendant's theory had been believed by the jury, the language of the justifiable use of force instruction given to the jury adequately applied to the facts as alleged by defendant. As there was no objection from defendant and no omission of substance, I can find no prejudicial error in the instruction as given.

Although I agree the exclusion of impeachment evidence as a discovery sanction is a drastic measure and not justified in this case, I believe that the exclusion of Knox's prior impeaching statement was harmless error.

An undue limitation of cross-examination by the defendant warrants reversal only where there has been a clear abuse of discretion and a showing of manifest prejudice to the defendant. (*People v. Gallo* (1973), 54 Ill. 2d 343, 297 N.E.2d 569.) Any error in restricting the cross-examination of a witness constitutes reversible error only if the judgment of conviction must stand or fall upon the credibility of that witness. (*People v. Boyce* (1977), 51 Ill. App. 3d 549, 366 N.E.2d 914; *People v. Banks* (1968), 103 Ill. App. 2d 180, 243 N.E.2d 669.) Improper limitation of the cross-examination of a witness whose testimony merely buttresses the prosecution may be deemed harmless. *People v. Washington* (1967), 81 Ill. App. 2d 162, 225 N.E.2d 673, *cert. denied* (1968), 390 U.S. 991, 19 L. Ed. 2d 1298, 88 S. Ct. 1190.

In this case, the testimony of Eugene Knox was not crucial or essential to the prosecution. Walter Davis, an eyewitness, saw the gun in defendant's hand when Freddie Johnson was shot. Johnny Wilson's testimony corroborated Davis' account. Knox, however, was in the back of the store at that time and did not see who shot Johnson. The record contains ample evidence to support a conviction on either the theory of voluntary manslaughter or murder for Johnson's death without reference to Knox's testimony. Knox did see defendant shoot Johnny Wilson, and his testimony on that issue was corroborated by Wilson and Davis. Knox's testimony was, at best, cumulative of the evidence presented by the other prosecution witnesses.

For these reasons, I would hold that any trial error was harmless and affirm the convictions.