THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNY W. TOWNSEND, Defendant-Appellant.

First District (5th Division)   No. 83—3027

Opinion filed August 30, 1985.

PINCHAM, J., dissenting.

James J. Doherty, Public Defender, of Chicago (Georgeen M. Carson, As-

sistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Karen C. Wirth, and Peter D. Zaper, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, defendant was convicted of attempted murder, aggravated battery and armed violence. The trial court vacated the convictions for aggravated battery and armed violence and sentenced him to a term of eight years on the attempted murder conviction. On appeal, defendant contends (1) that the jury was improperly instructed and (2) he was denied a fair trial by certain prosecutorial comments made in closing argument.

The charges arose from the shooting of Tamara Clark (Clark) by defendant on June 1, 1983. At trial, Clark testified that on the day of the incident her brother and her friend, Audrey Wesley (Wesley), were living with her and her three children in her apartment in Harvey. Defendant, her boyfriend of about six weeks, also stayed there several nights each week, including the previous night. Shortly after defendant's cousin, Robert "Eddie" Johnson (Johnson), arrived, at about 6 or 7 p.m., he, defendant and Wesley went out to purchase some rum and wine, and after finishing the first bottle of wine, they left again, at about 8 p.m., to buy more. When they returned, she put her children to bed, mixed a glass of rum and cola and shared a marijuana cigarette with Wesley. Sometime later, after repeated accusations by defendant that she did not love him, she took a butcher knife from the kitchen, held it to her chest and asked him in a sarcastic but joking manner whether he wanted her to kill herself to prove her love. When he laughed, she became very upset, asked him to leave and then informed him that she was going for a walk and would return shortly. Defendant followed her, grabbed her by the arm and ordered her not to leave, but she repeated that she wanted to take a walk, and when she slammed the door, causing the glass to break, she heard defendant say, "I'll kill that independent bitch." As she reached the bottom of the stairway, defendant pinned her against the wall, whereupon she suggested they return to the apartment instead of arguing outside. Once inside, she asked Johnson to tell defendant to leave and then went into her bedroom. Seeing that she was upset and crying, Wesley followed her, and while they were talking, defendant knocked and beat on the door, hollering for her to come out. She got up from the bed and, as she walked toward the door, picked up two knives—

one being the knife she held to her chest earlier and the other a knife she used while eating in her bedroom. Placing both knives in her right hand, she opened the door with her left hand, and upon exiting the room, holding the knives at her side, she saw defendant and Johnson "tussling" in the bathroom, which was directly across the hallway from where she stood. Defendant was holding a gun he normally carried strapped to his leg, and after raising himself out of the bathtub—into which he apparently had fallen during the fight—he pointed it at her and fired two shots, striking her in the chest and left shoulder. As she fell backward and slumped against the wall, defendant walked out of the bathroom, bent over, placed the gun a few inches from her face and fired it twice more, one bullet penetrating her nostril and mouth and lodging in her neck and the other striking her in her right hand, which she had raised in an attempt to cover her face and push the gun away. Defendant then ran out of the apartment, after which Johnson and Wesley drove her to the hospital.

On cross-examination, Clark stated that she had only one drink and two marijuana cigarettes throughout the entire day and that although she and defendant had been "horsing around" and wrestling earlier that evening, it was not until he returned from his second trip to purchase liquor and accused her of not loving him that they began to argue. She denied jumping on or punching defendant prior to leaving the apartment or taking two knives from the kitchen when she returned. Although she was afraid when she heard him screaming and kicking her bedroom door, she decided, against Wesley's advice, to go out to tell him to leave. She did not raise the knives in a threatening manner or say anything to defendant before he shot her.

Wesley testified to essentially the same version of events, adding that after Clark refused defendant's proposal of marriage, his mood changed and their previously good-natured wrestling became "a little rough." Wesley also testified that when she and Clark exited the bedroom, Clark took only one step out into the hallway, holding the knives at her side, before she (Wesley) heard two gunshots and saw Clark fall back against the wall and then slump to the floor. At that point, defendant—who had been out of her range of vision—came out of the bathroom holding the gun in both hands with his arms extended and fired two more shots at Clark from a distance of 3 or 4 inches. On cross-examination, Wesley could not recall whether she told the investigating officer that defendant had pounded on the bedroom door or that Clark exited the room carrying two knives, but she acknowledged that Clark was angry and upset when she first went into the bedroom.

Officer Newton testified that when he spoke to Wesley at the hospital, she appeared sober. Later that morning, defendant surrendered himself to the police and was advised of his *Miranda* rights, after which he said that he, Clark and others had been drinking at Clark's house the previous evening; that after an argument with him, Clark went into her bedroom with Wesley; that as he approached the bedroom door, she came out holding one knife at her side in her left hand and another in her right hand elevated to about ear-level; that he immediately fired the .25-caliber semiautomatic gun he was holding two or three times; and that he then ran out of the apartment and threw the weapon away. Defendant also stated that he thought that Clark was already "going down" as he fired the last two shots and that although he had learned how to disarm a person in martial arts training classes, he was not sure he could do so. On cross-examination, Newton acknowledged that defendant also told him that Clark came out of the bedroom cursing and threatening to kill him, which he believed she would do, and that he shot her to protect himself.

Dr. John E. Driscoll, the surgeon who was called in to treat Clark after she was transferred from the emergency room to the intensive care unit of Ingalls Hospital, testified that she sustained two gunshot wounds in her chest—the bullets internally lodging 3 or 4 inches below the location of their entrance, a wound through the joint of her right index finger and wounds through both her palate and tongue resulting from a bullet fired from close range and found lodged in her neck. He characterized the injuries as life-threatening and described her condition at the time of his first examination of her as critical.

On defense, Johnson testified that when he first arrived at Clark's apartment, she was "buzzing," as though she had been drinking. She thereafter consumed at least two or three rum and colas and smoked four or five marijuana cigarettes prior to the argument with defendant, which began because, disliking the smell of marijuana, he refused to sit next to her on the couch while she smoked it. When defendant got up to adjust the radio, Clark jumped on his back, cursing and screaming, and hit him two or three times. After he pulled Clark off of defendant, she went into the kitchen and then came back into the living room carrying two knives, but Wesley intervened and led her into the bedroom where she continued hollering and cursing. When he asked permission to use the bathroom, defendant directed him to it and then waited for him in the hallway outside Clark's bedroom. After he came out, he advised defendant to knock on the door and tell Clark that he (defendant) wanted to talk to her. Defendant did so, whereupon Clark emerged from the room carrying two knives, one at

her side and one raised up in her right hand, and walked toward defendant, threatening to kill him. Shortly after defendant backed up into the bathroom, he (Johnson) heard two or three gunshots and saw Clark fall back against the hallway wall. As he bent down to assist her, defendant came out of the bathroom and asked whether he had seen the knives and also if he would take Clark to the hospital. Responding in the affirmative to both questions, he then advised defendant to go to his house and wait there until he returned.

Defendant testified that Clark and Wesley smoked at least three or four marijuana cigarettes during the afternoon, "a couple more" in the evening and that each drank about three glasses of rum and cola. When he refused to sit next to Clark while she smoked the marijuana, she became very upset, jumped on him and hit him several times. She then left the apartment, slamming the door so hard that the glass broke, but he did not follow her. Sometime later, she returned to the apartment, took two knives from the kitchen and came into the living room, cursing at him. Wesley led her into the bedroom, where she continued hollering and cursing at him. He waited in the hallway outside Clark's bedroom while Johnson used the bathroom, and at Johnson's suggestion, knocked on the door—at first lightly and then a little harder—requesting to speak to her. A few seconds later, Clark swung the door open and came out, brandishing a butcher knife in each hand. When he asked her what was wrong, she screamed that she was tired of him telling her what to do and that she was going to kill him. As she came toward him with the knives, he backed into the bathroom and then, believing that she was crazy and would kill him, pulled his gun from his pocket and fired it at her from a distance of about 6 feet, falling into the tub as or just before the last shot discharged. When he got up, Clark was on the floor against the wall and Johnson was attending to her. After asking Johnson to take her to the hospital, he ran out of the apartment and went to Johnson's house, where he remained until the next morning, when he surrendered to the police.

On cross-examination, defendant denied that Clark had asked him to leave the apartment; that he followed her when she attempted to leave, called her an "independent bitch," threatened to kill her or tried to kick in her bedroom door. He stated that he loved her and had asked her to marry him, and that he consumed only three drinks that day and was not intoxicated. Although he had taken six months training in martial arts 15 years earlier, he was unsure of his ability to disarm Clark and felt that his gun was his best defense. He did not tell the police that Clark had jumped on him in the living room, nor

did he tell them that he walked out of the bathroom and shot her again as or after she slumped to the floor; however, he did recall saying that the exact details of the shooting were blurry.

On rebuttal, Assistant State's Attorney McGlynn testified that during an interview at the police station, defendant told him that as Clark walked toward him with the knives, he fired two or three shots and then, as she slumped to the floor, he fired another. McGlynn acknowledged, however, that defendant also said that he and Clark had been arguing all day and that when she came out from the bedroom, she was cursing and holding the knives as if to strike him with them.

OPINION

Defendant first contends that the trial court erred in giving IPI Criminal Instructions Nos. 24—25.09 (Initial Aggressor's Use of Force) and 24—25.11 (Provocation of First Force as Excuse for Retaliation) (Illinois Pattern Jury Instructions (IPI), Criminal Nos. 24—25.09, 24—25.11 (2d ed. 1981); see also Ill. Rev. Stat. 1981, ch. 38, par. 7—4(c)), each of which provides, essentially, that a person who initiates or provokes the use of force has only a limited right to thereafter use force in self-defense. He maintains that these instructions, given over his objections, were inappropriate and prejudicial because they may have caused the jury to assume that the trial court believed that the evidence supported a finding that he was the aggressor and/or that he provoked the hostilities which culminated in this shooting when, in fact, the evidence established that Clark was the initial aggressor and that he shot her in self-defense.

█ While we agree with defendant that "[i]t is error to submit an instruction to the jury where there is no evidence to support the giving of the instruction" (*People v. Shackles* (1977), 44 Ill. App. 3d 1024, 1026, 358 N.E.2d 1329, 1330), when there is a question as to whether the defendant or the victim was the initial aggressor, submission of an instruction on that issue is proper (*People v. Ellis* (1982), 107 Ill. App. 3d 603, 437 N.E.2d 409).

█ Here, according to Clark, whose testimony was substantially corroborated by Wesley, defendant refused to leave her apartment when asked by her to do so and, in an almost unbroken sequence of events leading up to the shooting, grabbed her by the arm, pinned her against a wall and threatened to kill her when *she* attempted to leave. When she went into her bedroom to get away from him, he followed her, beat on the door and ordered her to come out. Within seconds after she did, he raised the gun which he had already removed from his pocket, pointed it at her and fired two shots. He then came for-

ward and, as she slumped against the wall—wounded from the first two shots—pointed the gun at her face and fired two more shots at point-blank range. Although defendant denied the majority of these allegations and presented, through his and Johnson's testimony, a conflicting account of the shooting and the events preceding it which, if believed, could support a finding that Clark attempted to attack him and that he acted in self-defense, we believe there was sufficient evidence from which the jury could have concluded that defendant initiated or provoked the use of force in this case and that the instructions were proper, particularly since in addition thereto, an instruction on the justifiable use of force in self-defense was also submitted to the jurors, thereby allowing them to resolve the issue on either hypothesis (*People v. Ellis* (1982), 107 Ill. App. 3d 603, 437 N.E.2d 409; *People v. Crue* (1977), 47 Ill. App. 3d 771, 632 N.E.2d 430; *People v. Day* (1972), 2 Ill. App. 3d 811, 277 N.E.2d 745).

Defendant correlatively contends, however, that the jury was not fully instructed on the law relating to the justifiable use of force in self-defense because the trial court omitted, over his objection, a relevant portion (emphasized below) of IPI Criminal 2d No. 24—25.06, which provides:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend [himself] [another] against the imminent use of unlawful force.

However, a person is justified in the use of force which is intended or likely to cause great bodily harm only if he reasonably believes that such force is necessary to prevent [imminent death or great bodily harm to (himself) or (another)] *[the commission of a forcible felony]*." IPI Criminal 2d No. 24—25.06; see also Ill. Rev. Stat. 1981, ch. 38, par. 7—1.

Citing *People v. Easter* (1981), 102 Ill. App. 3d 974, 430 N.E.2d 612, and *People v. Milton* (1979), 72 Ill. App. 3d 1042, 390 N.E.2d 1306, defendant asserts that it was error for the trial court to refuse his request for inclusion of the provision that deadly force may be used to prevent the commission of a forcible felony. Specifically, he argues that in the light of his and Johnson's testimony, that Clark emerged from her bedroom holding two knives poised to strike him and advanced toward him in a threatening manner—actions which, he maintains, constituted aggravated assault or attempted aggravated battery—omission of the "forcible felony" language deprived him of his right to jury consideration of a "theory which provides a complete defense to the shooting."

Initially, we note that in *Milton*, evidence was presented at trial through three witnesses that the victim and his friend approached defendant as he was leaving the store where the men had been gambling and threatened to kill him if he did not surrender some of his winnings; that when he refused, they reached into his pocket to take the money; and that during the ensuing struggle, he shot them. In reversing defendant's conviction for voluntary manslaughter, the *Milton* court noted that the jury may have believed that this evidence established that defendant was resisting a robbery and that although such a finding would have mandated acquittal under the law that deadly force may be used to prevent the commission of a forcible felony, the omission of that language from IPI Criminal 2d No. 24—25.06 "did not permit such a result unless [the jury] also found that defendant was reasonably in fear of death or great bodily harm." (*People v. Milton* (1979), 72 Ill. App. 3d 1042, 1049, 390 N.E.2d 1306, 1311.) Unlike *Milton*, the record before us contains no evidence, nor does defendant assert, that Clark actually attacked him with the knives or that the shooting occurred during a struggle; and while his account of Clark's actions upon first emerging from the bedroom might arguably have justified the use of force to defend himself from the threatened attack, there was overwhelming evidence that he fired the third and fourth shots—at least one of which was described as "life-threatening" by the physician who treated Clark—from close range as or after she dropped the knives and fell to the floor. Indeed, in his own statements to Officer Newton and Assistant State's Attorney McGlynn, defendant stated that Clark was already "going down" as he fired the last two shots. It is our opinion that this evidence belies defendant's claim that he reasonably believed the shooting was necessary to prevent the commission of a forcible felony, and that the trial court did not err in refusing to give such an instruction. See *People v. McGee* (1982), 110 Ill. App. 3d 766, 443 N.E.2d 1047.

■ However, even assuming, *arguendo*, that the evidence was sufficient to warrant inclusion of that provision, in view of the jury's apparent rejection of defendant's claim that he reasonably believed the degree of force he used against the alleged imminent attack by Clark was necessary to protect himself from imminent death or great bodily harm, we, like the court in *People v. Easter* (1981), 102 Ill. App. 3d 974, 430 N.E.2d 612, on which defendant relies, find it untenable to suggest that the jury would have reached an opposite verdict on the very same evidence had the "forcible felony" language been given, and therefore conclude that any error by the trial court in refusing to give it was harmless.

Defendant's final contention is that he was denied a fair trial by several remarks made by the prosecutor during closing and rebuttal arguments. Specifically, he argues that the prosecutor improperly (a) expressed his personal belief in the credibility of the State's witnesses, (b) accused him of lying, and (c) impugned the integrity of defense counsel.

Concerning (a) he complains of only one comment, stating, "During closing arguments, the assistant State's Attorney summarized the testimony of the State's witness, the complainant and her friend Wesley. Then he stated:

'Mr. Quinn: Audrey Wesley testified essentially the same thing as did the victim, and I believe both those people.

Mr. Sopata: Objection to what counsel believes.

The Court: Continue, Mr. Quinn.

Mr. Quinn: Both of those people were believable.' "

■ Although the credibility of witnesses is a proper subject for comment in closing argument (*People v. Wallace* (1981), 100 Ill. App. 3d 424, 426 N.E.2d 1017; *People v. Nodal* (1980), 89 Ill. App. 3d 538, 411 N.E.2d 1087, it is fundamental that an attorney may not interject his personal belief in the veracity of their testimony (*People v. Watson* (1981), 94 Ill. App. 3d 550, 418 N.E.2d 1015). However, it is also well settled that improper prosecutorial remarks do not generally mandate reversal unless they are so prejudicial as to constitute a material factor in defendant's conviction (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200; *People v. Bailey* (1982), 108 Ill. App. 3d 392, 439 N.E.2d 4), or, put another way, that the jury would likely have reached a contrary verdict had they not been made (*People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68), and each case must be decided on its own facts (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200).

■ Unlike *People v. Valdery* (1978), 65 Ill. App. 3d 375, 381 N.E.2d 1217, the case on which defendant relies, wherein the prosecutor's lengthy narrative on the high quality and integrity of the State's witnesses was found to be highly prejudicial because it placed the weight of the State's Attorney's office behind the credibility of the State's witnesses, we do not believe that in view of the strength of the evidence against defendant the remark complained of here, "I believe both those people," though improper, could have constituted a material factor in his conviction. (See *People v. Bianchi* (1981), 96 Ill. App. 3d 113, 420 N.E.2d 1187.) We think that any prejudice which might have resulted from the remark was offset by the admonishments given the jurors at the outset of trial and again during final in-

structions that they were the sole judges of the credibility of the witnesses and that the statements of the attorneys were not evidence and should be disregarded when not based thereon. See *People v. Nodal* (1980), 89 Ill. App. 3d 538, 411 N.E.2d 1087.

■ Concerning (b), defendants states as follows:

"During defendant's closing argument, the following exchange took place:

'DEFENSE: "*** and Mr. Sopata might have said certain things. He just got into the case the day before yesterday."

PROSECUTOR: "Objection, Judge, That's a lie." '

Then, at the end of defense counsel's closing argument, the State made the following aside to the jury:

'PROSECUTOR: "He defends every case the same way. He doesn't defend them because he's innocent. He defends every case the same way." '

Thus, the State called defense counsel a liar and implied that he did not believe in the innocence of his client, but had some other motive for trying the case.

During the State's closing argument, the prosecutor paraphrased defendant's testimony, highlighting what he saw as inconsistencies. Then he claimed that defendant's testimony differed from defense counsel's opening argument.

'Somebody was lying to Mr. Sopata (defense counsel) before he testified.'

Defense counsel objected to this remark and the trial court sustained his objection."

We note initially that it is not improper to call the defendant a "liar" if conflicts in evidence make such an assertion a fair inference. (*People v. Tiller* (1982), 94 Ill. 2d 303, 319, 447 N.E.2d 174, 182.) Furthermore, our examination of the record reveals that in commenting on the credibility of the State's witnesses, defense counsel stated:

"Clark and Wesley are prime examples of people who testify with a motive for revenge. *** They lie. They distort the truth. Tamara Clark didn't come here for justice *** [She] came in here for vengeance, for revenge, because for whatever warped reason, she doesn't feel it was her fault that she was shot. *** they both lied through their teeth. If you think Tamara Clark lied to you once, then you can't believe a thing she said."

Although the prosecutor's objection was sustained, defense counsel went on to say,

"When did she [Clark] lie to you? When did she start lying to you people?

* * *

And Audrey Wesley, the good friend, comes in here and lies
through her teeth and the big charade about this, she even ad-
mitted that she read all the police reports before she testified."

In addition, defense counsel characterized Clark as "crazy" and sev-
eral times referred to Officer Newton and Assistant State's Attorney
McGlynn as the State's "knights in shining armor." Thus, in our view,
the prosecutor's comment that "somebody was lying to [defense coun-
sel] before he testified" was not only provoked by, but also innocuous
when compared to, the assailment by defense counsel of the honesty
and character of each of the State's witnesses and thus the comment
cannot now be advanced as a ground for reversal. As Mr. Chief Jus-
tice Burger stated in the recent United States Supreme Court opinion
of *United States v. Young* (1985), 470 U.S. ___, 84 L. Ed. 2d 1, 9, 105
S. Ct. 1038, 1043, " '[i]t should be accepted that both prosecutor and
defense counsel are subject to the same general limitations in the
scope of their argument.' "

Concerning (c), defendant states "The prosecutor denigrated
defendant and his counsel by calling them liars." He refers to two
comments, the first occurred at the outset of rebuttal argument when
the prosecutor stated:

"He [defense counsel] defends every case the same way. He
doesn't defend them because he's innocent. He defends every
case the same way."

While we agree that such comments are generally improper as tend-
ing to disparage the integrity of defense counsel (*People v. Starks*
(1983), 116 Ill. App. 3d 384, 351 N.E.2d 1298), we believe that this
remark was invited by defendant's attorney when, at the conclusion
of his closing argument he stated,

"When you defend somebody that is innocent, you tend to get
aggressive. When you defend somebody who you think is get-
ting set up, you defend him aggressively."

It should be noted here that although the comments set forth and
discussed above are the only allegations of prosecutorial misconduct
asserted by defendant in this appeal, the dissenting justice has
searched the record to find other comments made by the prosecutor
and has engaged in an extended discussion on them and as to the con-
duct of the trial judge in relation thereto. It is noted, however, that
no objection was made in the trial court and no issue was raised here
as to any improper conduct of the trial judge, and while many of the
remarks of the prosecutor referred to in the dissent were either not
objected to or were invited by comments of defense counsel and objec-

tions were sustained as to some of them, the dissenting opinion applied the plain error rule on the basis that due to "the prosecutor's egregious and inflammatory arguments \*\*\* [t]he jury was not allowed to properly resolve the two sharply conflicting versions of the shooting," and would reverse and remand for a new trial.

While it is not the function of this court to act as an advocate for the parties (see *People v. Spinelli* (1967), 83 Ill. App. 2d 391, 227 N.E.2d 779), or to search the record on appeal for unargued or unbriefed reasons to reverse a criminal conviction (*People v. Jimerson* (1979), 69 Ill. App. 3d 403, 388 N.E.2d 10), under Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)), notice may be taken in a criminal action of plain errors in the record which served to deprive defendant of a fair trial but which have not properly been preserved for review (*People v. McFarland* (1981), 93 Ill. App. 3d 136, 416 N.E.2d 769; see also *Hux v. Raben* (1967), 38 Ill. 2d 223, 230 N.E.2d 831). Rule 615(a) does not act as a general savings clause, however, and a conviction will not be reversed on the basis of improper prosecutorial remarks unless they were so prejudicial that real justice was denied (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200), or that they were such a material factor in defendant's conviction that the jury would likely have reached a contrary verdict had they not been made. *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.

Here, while it is correct, as the dissenting opinion points out, that defendant and Clark related "sharply conflicting" versions of the shooting, we note that Clark's account was supported not only by Wesley's testimony but also by that of other evidence presented at trial. Specifically, Doctor Driscoll—the physician who treated Clark immediately after the shooting—testified that the entrance wounds from the two bullets fired into Clark's chest were located above the area where the bullets ultimately lodged. This evidence regarding the downward trajectory of the bullets at once supports Clark's assertion that defendant—who, his own testimony established, is 5 inches taller than she—first fired the gun while in a stationary, upright position with his arms extended out from his body toward her as she exited the bedroom. Correspondingly, it tends to discredit defendant's testimony that he removed the gun from his pocket as he was backing up and fired it just before or as he lost his balance and fell into the bathtub, and impugns his counsel's argument that "She probably dropped the knife after she got hit twice. She's reeling back like this. He's backing up like this. The gun's pointing up." Similarly, the fact that one of the .25-caliber bullets, described by defense counsel in closing argument as a "small caliber" that "doesn't blow a hole through

you," did in fact pass through the joint of her right index finger and that another passed through the roof of her mouth and then through her tongue before lodging in her neck, lends credence to Clark's testimony that she raised her hand in an effort to push the gun away from her face when, as she sat slumped against the wall after being shot twice, defendant approached her, leaned over, pointed the pistol at her face and fired two more shots from a distance of 3 to 4 inches. In addition, the testimony of Officer Newton and Assistant State's Attorney Glynn, that during an interview at the police station defendant stated that he already had his hand on the gun when Clark opened the bedroom door; that he removed it from his pocket as she exited and fired two or three shots; and that he thought she was "going down" as he fired one or two more shots, also contradicts defendant's trial assertion that he pulled the gun from his pocket as he was backing up, and conflicts with his uncorroborated testimony regarding a conversation he claims to have had with Clark after she exited the bedroom in which he asked her, "Tammy, what's wrong?" to which she responded that she was tired of him telling her what to do and thereupon began cursing and threatening to kill him.

■ Although it is the dissent's opinion that we are improperly engaging in the jury function of speculating on these and "other facts" as the basis for affirming defendant's conviction, we believe that since the facts concerning the trajectory of the bullets and the relative positions of defendant and Clark at the time of the shooting were presented through the testimony of various witnesses at trial and were discussed by the attorneys in closing arguments, they are proper subjects of consideration by us in our review of the record in its totality; and on the basis of that review we conclude that there was ample evidence to support the jury verdict and do not believe that it would have been different had the remarks and conduct complained of not occurred, or that, even where improper, the prosecutor's comments or the trial court's rulings thereon were so prejudicial as to require reversal and remandment for a new trial under the plain-error doctrine.

For the reasons stated, defendant's conviction for attempted murder is affirmed.

LORENZ, J., concurs.

JUSTICE PINCHAM, dissenting:
I dissent. The defendant, Johnny W. Townsend, was charged with armed violence, aggravated battery and attempted murder, arising out of the shooting of Tamara Clark. His defense was self-defense.

The scenario of this incident placed on one side Tamara Clark and the other State witnesses, and on the other side were the defendant and his witness. On both sides there were the too frequently present ingredients of alcohol and drugs. Somewhere in between were verbal expressions of love, suddenly transformed into hate, a resultant physical attack and attendant fear. The detailed facts are adequately set forth in the majority opinion and need not be here repeated. The State's evidence, although adequate to sustain the conviction, is far from overwhelming. When the veneer and icing are removed, however, there remains the following uncontroverted material facts.

The alleged victim, Tamara Clark (Clark), and her friend, Audrey Wesley (Wesley), imbibed in alcoholic beverages and smoked marijuana during the evening prior to the shooting. The defendant, Johnny W. Townsend (Townsend), and his cousin, Robert "Eddie" Johnson (Johnson), also drank intoxicating beverages before the shooting but they did not smoke any marijuana. The defendant accused Clark of not loving him. Clark went to the kitchen and returned with a butcher knife to the living room, where Wesley, Johnson and the defendant were congregated. Clark held the butcher knife to her chest and asked the defendant, "What do you want me to do, kill myself?" The defendant laughed at this gesture, which prompted Clark to go to her bedroom, get dressed and leave the house. As she departed, Clark slammed the door so hard that she broke the glass pane in the door. Clark came back into the house and entered her bedroom, followed by Wesley, who was trying to calm her down. Shortly thereafter, the defendant knocked on the closed bedroom door and asked Clark to come out. Clark picked up two butcher knives—one that she had gotten earlier from the kitchen, the other one she kept in her bedroom. With the two butcher knives in her possession, Clark opened the bedroom door to come out.

Based on the foregoing undisputed facts, the following conclusions are inescapable: (1) Clark had shown that she was angry; (2) Clark armed herself with two butcher knives while in the safety of her bedroom; and (3) while armed with the two butcher knifes, Clark left her bedroom to go where the defendant was.

The evidence on what occurred as Clark left the bedroom is conflicting. The Clark-Wesley version was that Clark left the bedroom with the two butcher knives in one hand, that the defendant, with a gun in his hand, tussled with Johnson in the bathroom to try to get out, and that the defendant then shot Clark. The defendant-Johnson version was that Clark left the bedroom brandishing a butcher knife in each hand, that Clark approached the defendant with the knives

poised and screamed at the defendant, "I'll kill you," and that as the defendant backed away in fear, he pulled his gun and shot Clark four times.

Eddie Johnson, pursuant to the defendant's request, took Clark to the hospital. A few hours later, the defendant surrendered to the police and gave them a statement of the shooting, which statement was substantially the same as his version of the facts as hereinbefore set forth.

Regardless of the strength or weakness of the State's evidence, it should not have been embellished nor should the jury have been persuaded to convict by the prosecutor's egregious and inflammatory arguments. The jury was not allowed to properly resolve the two sharply conflicting versions of the shooting. Reversal and a new trial are therefore demanded.

The majority's condonation of the prosecutor's egregiously prejudicial arguments cannot be reconciled with this court's recent emphatic condemnation of such arguments in *People v. Starks* (1983), 116 Ill. App. 3d 384, 395, 451 N.E.2d 1298, where the court observed that "the volume of cases in which the use of *** [an] erroneous argument is raised as an issue indicates that it has become a standard arrow in the prosecutorial quiver."

In the pending case, the majority's refusal to reverse the defendant's conviction, in spite of the court's recognition of the gross impropriety of the prosecutor's prejudicial arguments, "encourage[s] its proliferation." (*People v. Starks* (1983), 116 Ill. App. 3d 384, 395.) I cannot accept the "harmless error" and "invited response" concepts upon which the majority approves the prosecutor's improper arguments. Nor can I affix my stamp of approval to such gross prosecutorial misdeeds.

While I wholeheartedly agree with the majority that it is not the function of this court to act as an advocate for the parties, I just as emphatically believe that a reviewing court should not aggressively (or passively) condone flagrant prosecutorial misconduct by blinking at it under harmless error visors. Nor do I believe that a reviewing court should engage in the jury function of speculating on the trajectory of bullets or the relative positions of the victim and the defendant when the shots were fired or on other facts as a basis for affirming a criminal conviction.

The majority asserts that the improper prosecutorial remarks referred to in this dissent were invited by the defense counsel's comments or were not objected to. However, this dissent clearly points out otherwise.

The third ground for reversal urged by defendant in his brief under Points and Authorities and argued in his brief and orally before this court is "Defendant was denied a fair trial where the prosecutor wrongly placed the weight of his office behind the State's witness by stating his personal belief in their credibility, denegrated both defendant and his attorney by accusing defense counsel of lying to the jury and by implying defendant lied to his own counsel." Thus, the majority's assertion that the dissent has *sua sponte* raised and decided this issue under the plain-error rule, Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)), is inaccurate.

Assistant State's Attorney Patrick Quinn commenced his opening argument to the jury by expressions of gratitude to them for their jury service. He immediately thereafter improperly injected himself into his argument as follows:

"[W]e, as State's attorneys, *we represent the People of Illinois [and] cannot choose our victims. Our victims come to us* through the police departments after they are injured or harmed in some way.

*Our victim in this case* was not very articulate. \*\*\*. Crime affects poor people. It affects uneducated people. It is committed by such people, but more often than not, it harms those people and this is one of those cases.

Certainly, *we would prefer* to have college professors up there being able to talk to you or from whatever background you would be from, *we would prefer* to have people like that. *But unfortunately for us* that's not how it works." (Emphasis added.)

Whether justified or not, the general public believes that assistant State's Attorneys have some degree of prosecutorial discretion which is exercised in favor of prosecuting only those cases which, in the judgment of the assistant, merit prosecution. It was improper for the assistant to endeavor to enhance the merits of this case by personally injecting himself into the prosecutorial discretion aspect of the case. As this court has stated, "[T]here is a boundary of propriety which is so easily crossed by the use of this argument that it would be far better if the argument was no longer made." *People v. Starks* (1983), 116 Ill. App. 3d 384, 395, 451 N.E.2d 298.

When Assistant State's Attorney Quinn concluded injecting his personal opinions before the jury, he then discussed the testimony of the alleged victim, Tamara Clark. Quinn even prefaced this discussion with an improper comment:

"I will again briefly go through [the evidence] with you a lit-

tle bit because it was somewhat confusing, certainly, *at least to me*." (Emphasis added.)

Assistant State's Attorney Quinn then recited Tamara Clark's testimony to the jury. He thereafter egregiously stated:

"Audrey Wesley testified essentially the same thing as did the victim, and *I believe both of these people*.

MR. SOPATA [defense counsel]: Objection to what counsel believes.

THE COURT: Continue, Mr. Quinn.

MR. QUINN: Both of those people were believable. There were some inconsistencies. \*\*\*. I don't know if you caught it. *I caught it, because I have to take a lot of notes. \*\*\* We are all allegedly professional individuals and we have, believe me, gone over this case many times*." (Emphasis added.)

Here, the prosecutor pompously injected his personal confidence into the integrity and veracity of his witnesses. This was grossly improper and impermissible. (*People v. Watson* (1981), 94 Ill. App. 3d 550, 418 N.E.2d 1015.) The American Bar Association's Standing Committee on Standards for Criminal Justice has promulgated standard 3—5.8(b) (2d ed. 1980), which provides, "[I]t is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony \*\*\*." The accompanying commentary to that standard explains that the underlying policy for this prohibition is that a prosecutor's personal opinion of a witness' veracity is unsworn and uncross-examined testimony which exploits the influence of the prosecutor's office and breaches the "objective detachment" that should separate the prosecutor from the cause he argues.

Chief Justice Burger aptly pointed out in *United States v. Young* (1985), 470 U.S. ___, ___, 84 L. Ed. 2d 1, 14, 105 S. Ct. 1038, 1048:

"The prosecutor's vouching for the credibility of witnesses \*\*\* pose[s] two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."

The Supreme Court reversed the judgment of the court of appeals, which had ordered a new trial on the ground that the prosecutor's argument did not seriously affect the fairness of the trial.

(*United States v. Young* (1985), 470 U.S. ___, ___, 84 L. Ed. 2d 1, 15, 105 S. Ct. 1038, 1049.) In the pending case, the prosecutor's argument *did* seriously affect the fairness of the trial. The *Young* case is therefore extremely persuasive and is cited throughout this dissent because of the court's thorough analysis of inflammatory jury arguments.

The majority opinion in this case expressly recognizes the gross impropriety of the prosecutor's personal expressions of his belief in the testimony of his witnesses, Wesley and Clark. The majority, however, expressly sanctions the improper argument, in part, because the trial judge admonished the jury "that they were the sole judges of the credibility of the witnesses [and] the attorney's statements were not evidence." But these excuses miss the point. Of course the jury is the sole judge of the credibility of the witnesses and of course the prosecutor's statements are not evidence. But neither of these admonitions, severally or jointly, remove, alter or relate to the prosecutor's effort to improperly influence the jury in deciding the witnesses' credibility by his statement of his belief in their testimony.

It is indeed noteworthy that the trial judge tremendously enhanced the prejudice of the assistant State's Attorney's improper expressions of his personal belief in the testimony of Audrey Wesley and Tamara Clark. When defense attorney Sopata objected "to what counsel believes," the trial judge erroneously failed to sustain the objection. The trial judge did not reprimand the prosecutor for the improper argument, nor did he admonish the jury to disregard the prosecutor's argument of his personal belief in his witnesses' testimony. In response to the defense attorney's objection, the trial judge simply responded, "Continue, Mr. Quinn." Mr. Quinn promptly complied, stating, "Both of those people were believable."

This was not an isolated expression by the prosecutor of his personal opinion. Assistant State's Attorney Quinn repeatedly dispersed his personal opinions throughout his argument. Quinn continued:

> "They [the defendant and his brother, Edward Johnson] would have you believe Henry Clark, the 18-year-old younger brother [of the victim Tamara Clark], was not there to chase him out the door. *I find that incredible.*
>
> \*\*\*. But he told Assistant State's Attorney McGlynn he shot her two or three times \*\*\*. Yes, he knows Kung Fu. Yes, he knows how to disarm people with knives. But he doesn't feel comfortable with that. *I wouldn't feel comfortable with that either.*
>
> MR. SOPATA: Objection to what counsel feel.

THE COURT: Proceed." (Emphasis added.)

Here again, the prosecutor improperly injected his personal opinions and feelings into the case. Here again, the defense attorney objected, and here again, the trial judge refused to take any appropriate remedial action to rectify the prosecutor's transgressions. The improprieties were enhanced by judicial approval, through inaction.

Chief Justice Burger stated in *United States v. Young* (1985), 470 U.S. ___, ___, 84 L. Ed. 2d 1, 8-9, 105 S. Ct. 1038, 1043-44:

> "The kind of advocacy shown by this record has no place in the administration of justice and should neither be permitted nor rewarded; a trial judge should deal promptly with any breach by either counsel.
>
>     * * *
>
> We emphasize that the trial judge has the responsibility to maintain decorum in keeping with the nature of the proceedings; 'the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct.' [Citation.] The judge 'must meet situations as they arise and [be able] to cope with *** the contingencies inherent in the adversary process' ***.
>
> The situation brought before the Court of Appeals was but one example of an all too common occurrence in criminal trials *** [where] the trial judge takes no corrective action."[1]

In the case at bar, as in *Young*, the trial judge took no corrective action against the prosecutor's misconduct. However, in the case at bar, unlike in *Young*, it was not the defense counsel who initiated the improper jury argument. Rather, it was the prosecutor. Nor can it be accurately contended in the case at bar that the prosecutorial transgressions were waived by a failure of timely objections or a failure to assign the errors as grounds for a new trial, frequently relied on by prosecutors in urging affirmance of unjust criminal convictions.

In the case at bar, Assistant State's Attorney Quinn was not satisfied and did not conclude his improper argument of his personal opinions and beliefs, previously set forth. He further proclaimed:

> "You heard our witnesses testify [that] when she slammed the door in his face, he was so mad, he said, 'I'll kill that independent bitch.' Ladies and gentlemen, *I believe that's where the*

---

[1]The *Young* decision sets forth in several footnotes ABA Standards for Criminal Justice, including standard 4—7.8(e) (2d ed. 1980), which provides, "It is the responsibility of the Court to ensure that final argument to the jury is kept within proper and accepted bounds." 470 U.S. ___, ___ n.7, 84 L. Ed. 2d 1, 9 n.7, 105 S. Ct. 1038, 1043 n.7.

*case lies* and *I believe, ladies and gentlemen, if you are to believe the Defense's defense of self-defense, you must believe them,* per that instruction, that the defendant reasonably believed he had to shoot Tamara Clark the first time, that he reasonably believed after that, he had to shoot her a second time, and that he reasonably believed that he had to shoot her a third and a fourth time, because all of those times were necessary to stop her from killing him. That is incredible. \*\*\*. *And I believe after you deliberate, you will agree with me* that you can't shoot a young lady or a young person four times, not in Illinois, and expect to get away with it.

MR. SOPATA: Objection.

MR. QUINN: And claim then that she had it coming.

THE COURT: Sustained.

MR. QUINN: I am asking you, ladies and gentlemen, to reject their theory of self-defense which is the only defense that is here. Please do so." (Emphasis added.)

This was the first objection sustained by the trial judge to Quinn's improper argument. This singular sustainment miserably failed to quench the glowing flames of this progressively inflammatory argument.

In *People v. Whitlow* (1982), 89 Ill. 2d 322, 341, 433 N.E.2d 629, the defendants were convicted of securities law and theft offenses. The prosecutor argued to the jury:

" '*What this says I believe is that these projects were truly projects of Truman Gibson* and had they gone anywhere at all, the shareholders of Royal National might as well have jumped in the Mississippi River because Truman Gibson was going to be on the gravy train and they were going to have to sit around and split up shares of a company that had been dissolved in 1974.' " (Emphasis added.)

The supreme court reversed and held:

"The quoted comment involves an expression of the prosecutor's own belief. This court has consistently held that it is improper for the prosecutor to express his own opinion as to the defendant's guilt."

The supreme court further held that it was "unnecessary to assess the prejudicial effect of each isolated comment," that the defendants did not waive the objections to the comments by their failure to timely object and that the comments were not harmless error even if evidence of the defendants' guilt was overwhelming. *People v. Whitlow* (1982), 89 Ill. 2d 322, 341-42.

As previously pointed out, the prosecutor's numerous improper expressions of his personal opinions and beliefs were not an isolated expression of his personal opinion. Also, improper comments were expressed in the prosecutor's opening argument to the jury and therefore could not have been invited by the defense. Moreover, as previously pointed out, the State's evidence was not overwhelming. In this regard, the following language of this court in *People v. Starks* (1983), 116 Ill. App. 3d 384, 396, 451 N.E.2d 1298, in which the defendant's murder and attempted armed robbery convictions were reversed and a new trial ordered because of an assistant State's Attorney's improper argument, is applicable here. This court stated:

> "We stress that, although reversal for a new trial is the appropriate disposition of the instant case, our holding here should in no way be taken to apply only to cases in which the evidence of the defendant's guilt is not overwhelming so as to authorize this type of prosecutorial brinkmanship in cases where the evidence is stronger."

Another ploy in which Assistant State's Attorney Quinn engaged during his opening argument was most unique but equally improper. Quinn urged the jury to compare the credibility of two of the State's witnesses with the credibility of the defense attorneys. Quinn argued:

> "I would tell you to compare the demeanor on the stand of those two witnesses, Audrey Wesley and Tamara Clark, and compared to the demeanor of our attorneys that have practiced in this courtroom before you, and tell me who you believe."

Assistant State's Attorney Quinn thereafter, in the following argument, accused the defendant of lying to his attorney:

> "If you recall in his opening statement, Mr. Sopata said we will show that Tamara Clark had drank large quantities of liquor. His own defendant denied that, saying she had had a couple of drinks. He told you in his opening statement that Tamara Clark was upset because his client, Johnny Townsend, would not smoke marijuana with her, and Johnny Townsend testified, no, that's not why she was mad at me. *'She was mad at me because I would not sit near her. It was not because I would not smoke marijuana.'* Somebody was lying to Mr. Sopata before he testified.
>
> MR. SOPATA: Objection.
>
> THE COURT: Objection is sustained. Proceed, Mr. Quinn."

(Emphasis added.)

But the assistant State's Attorneys were not completely satisfied with this inappropriate tirade against the attorney-client relationship. They

extended their accusations of prevarication directly against the defense attorney as follows:

"DEFENSE ATTORNEY APRATI: ***. Mr. Sopata might have said certain things. He just got into this case the day before yesterday.

MR. [Steve] PUISZIS [assistant State's Attorney]: *Objection, Judge. That's a lie.*

THE COURT: Objection is sustained."

(Emphasis added.)

Such an acerbic argument has no place before a jury or in a court of law. The trial of a case should not become so heated or sink to the level of one lawyer calling his adversary "a lie." If Mr. Aprati misstated that Mr. Sopata "just got into this case the day before yesterday," certainly the misstatement did not merit the prosecutor calling him "a lie" on such an innocuous point. The trial judge inflamed this highly prejudicial remark by sustaining the prosecutor's objection.

A mere cursory review of the court's rulings on the prosecutor's objections to defense attorney Aprati's closing argument reveals a cryptic display of the trial judge's disparity in tone and attitude in his rulings. The rulings were strikingly favorable to the prosecution. Attorney Aprati argued to the jury:

"Now, remember, you heard Tamara Clark's testimony. You heard Audrey Wesley's testimony. They both lied through their teeth. If you think that Tamara Clark lied to you once, then you can't believe a thing she said.

MR. QUINN [assistant State's Attorney]: Objection, Judge.

MR. PUISZIS [assistant State's Attorney]: *That's totally improper, Judge.*

THE COURT: *I agree.* Counsel, proceed. (Emphasis added.)

It is not improper comment to call a witness a liar if conflicts in the evidence make such an assertion a fair inference. (*People v. Tiller* (1982), 94 Ill. 2d 303, 319, 447 N.E.2d 174; *People v. Starks* (1983), 116 Ill. App. 3d 384, 394, 451 N.E.2d 1298; *People v. Cukojevic* (1981), 103 Ill. App. 3d 711, 721, 431 N.E.2d 1154.) Defense attorney Aprati's argument that Clark and Wesley lied was therefore proper comment, and such assertion was a fair inference from the evidence. There were numerous conflicts between the testimony of the State's witnesses Clark and Wesley and the testimony of the defense witnesses Eddie Johnson and the defendant. On what legal basis Assistant State's Attorney Quinn objected, or on what legal basis Assistant State's Attorney Puiszis contended the argument was "totally improper," is obscure. The legal basis for the trial judge's agreement

with the contention that the argument was improper is equally unintelligible. The trial judge's hasty acquiescence in the prosecutor's labeling of the defense attorney's argument as improper, when it was not improper, is only one of several disparaging comments against the defendant or his attorney during the defense attorney's argument.

Defense attorney Aprati further argued to the jury:

"On direct examination, she said she had one joint at around 8:00 o'clock, and then all of a sudden, I got up there and I asked her well, you had a joint at 4:00 o'clock, right? Yeah, 4:00 o'clock. Then she said 8:00 o'clock.

MR. PUISZIS: Objection, misstatement.

MR. SOPATA: It's not a misstatement.

THE COURT: All right, gentlemen.

MR. PUISZIS: Judge, I have an objection. Counsel is implying—

THE COURT: The jury has heard all the evidence in this case. *If Mr. Aprati, if his notes are inaccurate,* I am sure the jury will be able to determine that.

MR. APRATI: Ladies and gentlemen, when I stand up here, *I don't misstate the evidence.*

MR. PUISZIS: *Objection to that, Judge.*

THE COURT: *That will be stricken.*

MR. APRATI: If I say something that wasn't in evidence, I am sorry. I recall the testimony as I heard it." (Emphasis added.)

Why or on what basis the trial judge expressed the possibility that Mr. Aprati's notes were inaccurate, but not the prosecutor's notes, is unclear. The basis upon which the court struck the defense attorney's efforts to explain to the jury that he did not "misstate the evidence" is likewise opaque.

Defense attorney Aprati's argument and the court's rulings thereon proceeded further:

"MR. APRATI: ***. How do you break a door if you're not mad? You have to slam a door pretty hard to break a door, and you know why? Because she was drinking and she was smoking four or five joints and she was crazy.

MR. QUINN: Objection.

THE COURT: Sustained.

MR. APRATI: She was so mad, she slammed the door and broke it.

MR. QUINN: I hate to interrupt, Judge. You sustained it and he kept going, Judge, and that is very improper.

THE COURT: As far as the characterization that she was crazy, that will be stricken from the record, and the jury will disregard it.

MR. APRATI: She was high, ladies and gentlemen. All right.

\* \* \*

She goes into the bedroom and, according to her, Johnny Townsend comes up to the door and starts banging on the door like a madman.

What does she do? Well, how did she get two knives in the first place? Well, lo and behold, she's got to think of some reason why she had two knives. So all of a sudden, she says, 'Well, I eat my meals in the bedroom sometimes,' with a nine-inch butcher knife. She eats her meals. What does she do, cut her Twinkies with it?

MR. QUINN: Objection, Judge.

THE COURT: Objection sustained."

The trial judge consistently displayed an unusual swiftness and firmness in sustaining the prosecutor's objections to the defense attorney's argument, which he miserably failed to display in ruling on the defense attorney's objections to the prosecutor's opening argument.

Defense attorney Aprati's argument continued:

"Let's talk about the number of shots that were supposedly fired here, and *I find this incredible*, just—

MR. PUISZIS: Objection, Judge.

THE COURT: Objection is sustained." (Emphasis added.)

Defense attorney Aprati's belief of incredibility about an aspect of the evidence had no place in his argument and the court properly sustained the prosecutor's objection to it. *A fortiori*, the defense attorney's objections to Assistant State's Attorney Quinn's repeated expressions of his personal beliefs, opinions and feelings of incredibility should likewise have been sustained.

Defense attorney Aprati further argued:

"[Audrey Wesley] even admitted that she read all these police reports before she testified. She knew what was coming, exactly what was coming.

MR. PUISZIS: Objection, Judge. There is nothing improper about allowing a witness to read the police reports.

THE COURT: You're absolutely right."

Aprati did not suggest by this argument that it was improper for Wesley to read the police reports, as the prosecutor erroneously stated. The trial judge improperly added credence to the prosecutor's

erroneous contention by stating, "You're absolutely right." Aprati was merely urging that in determining Wesley's credibility, the jury should consider the fact that Wesley read the police reports before she testified.

Further argument by the defense attorney proceeded as follows:

"The law does not require that you only have to shoot somebody two or three or four or five times. The law in the State of Illinois says when you're confronted with deadly force—

MR. QUINN: Objection, Judge, to any statements other than instructions.

THE COURT: The Court will instruct the jury as to what the instructions are and what the law is.

* * *

MR. APRATI: Judge, it's a subjective belief. I'll give him the case law.

THE COURT: Mr. Aprati, would you please quit arguing with the State's Attorneys and conclude your argument.

MR. APRATI: ***. You don't have to use infallible judgment when you're under great stress and excitement. You don't have to sit there when somebody is coming at you with two nine-inch butcher knives, like a raging bull, and shoot once and then think to yourself, my God, if I shoot her again, I might get in trouble. So maybe I should only shoot once. Or after the shot, think, well, maybe I should only shoot twice. No. No way. You can kill somebody when they come at you with butcher knives.

MR. QUINN: Objection, Judge. That is not the law in Illinois.

THE COURT: Objection is sustained."

It need not be decided whether it was inappropriate for the trial judge to accuse the defense attorney of arguing with the prosecutors. Suffice to say that this and other similar remarks by the court reflect the court's favoritism toward the prosecution. It is difficult to understand why the court sustained the objections to defense counsel's self-defense argument when the court had previously permitted Assistant State's Attorney Quinn to read to the jury during his opening argument the court's numerous jury instructions on attempted murder, aggravated battery and armed violence, and that "A person is not justified in the use of force if he initially provokes the use of force against himself with the intent to use that force as an excuse to inflict bodily harm upon the other person." To restrict defense counsel in his argument on the use of force in self-defense was therefore unwarranted.

Defense attorney Aprati further argued:

"The State's attorney is going to have the opportunity to come back and speak to you a second time. \*\*\*. I don't know what he's going to say. But I can tell you right now, if I had an opportunity to stand up a second time, I'd be able to rebut every single thing that he said.

MR. PUISZIS: Objection, Judge.

THE COURT: *Mr. Aprati, you know its improper for that statement.* The prosecution begins. You respond and the prosecution closes. The defense does not have the opportunity to respond after the final closing by the State." (Emphasis added.)

Exhaustive legal research fails to reveal wherein the foregoing argument was improper. The absence of any authority condemning such argument leads to the inescapable conclusion that the argument was most appropriate.

Defense attorney Aprati finally argued to the jury:

"When you defend somebody that is innocent, you tend to get aggressive. When you defend somebody who you think is getting sent up, you defend him aggressively.

MR. PUISZIS: Objection, Judge. That is improper.

THE COURT: Objection sustained."

This argument was improper. Just as it is improper for a prosecutor to express his personal opinion of a defendant's guilt to a jury (*People v. Whitlow* (1982), 89 Ill. 2d 322, 341, 433 N.E.2d 629), it is likewise improper for a defense attorney to state his personal opinion of a defendant's innocence. The argument should not have been made. The ABA Standard for Criminal Justice 4—7.8 (2d ed. 1980) provides that it is unprofessional for an attorney to state his personal belief or opinion in his client's innocence. The trial judge therefore properly sustained the prosecutor's objection to this argument by the defense attorney. It is significant that he neglected to rule with equal dispatch and haste on the repeated defense objections to the numerous improper opening arguments by Assistant State's Attorney Quinn.

Next, Assistant State's Attorney Steve Puiszis began his closing rebuttal argument as follows:

"He defends every case the same way. He doesn't defend them because he's innocent. He defends every case the same way.

MR. APRATI: Objection.

THE COURT: *I think what's fair is fair.* Objection sustained." (Emphasis added.)

The trial judge improperly prefaced his sustainment of the objection with the statement that he thought the argument was *fair*. His

unwarranted comment minimized his ruling and constituted judicial sanction of the prosecutor's derogatory comment about the defense attorney. The majority states that this argument was invited by defense attorney Aprati's argument set forth above. But the trial judge sustained the prosecutor's objection to the defense argument. Even if Puiszis' closing rebuttal argument was invited, it certainly cannot be said that the defense attorney invited Assistant State's Attorney Quinn's highly prejudicial opening argument—Quinn's opening jury argument was given before the defense attorney's jury argument. Thus, under no circumstances is this the appropriate case for application of the "invited comment," "invited error," or "invited response" doctrine.

In *United States v. Young* (1985), 470 U.S. ___, ___, 84 L. Ed. 2d 1, 5-6, 105 S. Ct. 1038, 1041, the defense counsel's summation contained numerous disdainful remarks about the prosecutor. Defense counsel additionally argued, "I submit to you that there's not a person in this courtroom including those sitting at [the prosecutor's] table who think that Billy Young [the defendant] intended to defraud Apco." Counsel also stated that the defendant was "the only one in this whole affair that has acted with honor and integrity." The prosecutor did not object to the defense attorney's argument, but in his closing rebuttal argument, the prosecutor repeatedly expressed his personal opinions about the evidence and the defendant's guilt "since it was asked." Reversing the defendant's conviction for a new trial, the court of appeals held that the prosecutor's closing rebuttal argument was sufficiently egregious to constitute plain error and the defendant's failure to object did not preclude appellate review. The Supreme Court reversed the court of appeals but pointed out, "Prosecutors sometimes breach their duty to refrain from overzealous conduct by *** offering unsolicited personal views on the evidence." *United States v. Young* (1985), 470 U.S. ___, ___, 84 L. Ed. 2d 1, 7, 105 S. Ct. 1038, 1042.

In the case at bar, Assistant State's Attorney Quinn breached his duty to refrain from overzealous conduct by repeated expressions during his opening argument of his unsolicited personal views of the evidence. with regard to the "invited error," "invited response," "invited comment" doctrine, the court held in *Young*:

> "*Clearly two improper arguments—two apparent wrongs—do not make for a right result.*
>
> * * *
>
> In retrospect, perhaps the idea of 'invited response' has evolved in a way not contemplated. *Lawn* [355 U.S. 339, 2 L.

Ed. 2d 321, 78 S. Ct. 311] and the earlier cases cited above should not be read as suggesting judicial approval or—encouragement—of response-in-kind that inevitably exacerbate the tensions inherent in the adversary process. (Emphasis added.) 470 U.S. ___, ___, 84 L. Ed. 2d 1, 9-10, 105 S. Ct. 1038, 1044-45.

In *Young*, the trial judge took no corrective action against the defense attorney's improper argument or the prosecutor's equally improper response. No corrective action was requested. In the case at bar, however, the trial judge did just the opposite. He took no corrective action against the prosecutor's improper opening argument, in spite of defense counsel's repeated requests to do so. Yet, he swiftly took the corrective action requested by the prosecutor when the defense attorney improperly responded in kind.

Also in *Young*, the court stated, "Not a single witness supported [the defendant's] asserted defense *** and several witnesses flatly rejected [the defense]." In the case at bar, the majority erroneously concludes that the improper prejudicial arguments did not deny the defendant a fair trial and that the evidence was not so closely balanced that the jury's guilty verdict would have been different, even though the defense was supported by witnesses, whose testimony was in sharp contrast to the testimony of the prosecution witnesses.

There was yet more inflammatory closing rebuttal argument by Assistant State's Attorney Puiszis:

"There is one animal that God has given a very unique defense mechanism to in nature and that is the octopus. You know how the octopus defends himself when he gets in trouble? When he gets backed into a corner, he starts squirting out ink and he muddies up the water. And when the water is so clouded, he escapes.

Well, in this case, ladies and gentlemen, here is the octopus, and what you heard from Mr. Aprati was all the ink that he wants to try and muddy up the water, so that his client can walk out that door, out this courtroom, a free man, and escape the responsibility for his action. I have to shake my head because I don't know if my information was the same one as Mr. Aprati's. ***.

He's on trial. Mr. Aprati has done everything he can to try and draw your attention away from his actions. Why? Because he knows if you go back in the jury room and you remember

what he tells the Assistant State's Attorney the night of that happening, *** he's guilty of attempt murder. ***.

MR. APRATI: *I'm going to object, Judge.*

MR. PUISZIS: *So he's trying to draw your attention* from all—

THE COURT: *On what basis?*

MR. APRATI: *He's bringing me into his closing argument.*

THE COURT: *I think he's responding to your argument.* Proceed, Mr. State's Attorney." (Emphasis added.)

This court resoundingly condemned the prosecutor's conduct that the defense counsel was engaging in chicanery in order to win an acquittal for his client in *People v. Weathers* (1975), 62 Ill. 2d 114, 119-21, 338 N.E.2d 880, *People v. Starks* (1983), 116 Ill. App. 3d 384, 392, 451 N.E.2d 1298, *People v. Clark* (1983), 114 Ill. App. 3d 252, 256, 448 N.E.2d 926, and *People v. Brown* (1983), 113 Ill. App. 3d 625, 630, 447 N.E.2d 1011. The arguments in the case at bar were just as inflammatory as were the arguments in those cases. Puiszis' argument set forth above reveals an utter contemptuous disregard for the boundary of propriety of prosecutorial jury arguments.

The *coup de foudre* of Assistant State's Attorney Puiszis' closing rebuttal argument was as follows:

"What do you think defendants do? They deny committing the crimes, because they do not want to be convicted. You know another thing to consider *who is the only person who is allowed to sit in the courtroom and hear all the other witnesses' testimony? Him.*

MR. SOPATA: Objection, Judge. He knows the defendant has a right to be at his trial. Improper argument.

MR. PUISZIS: That's true.

THE COURT: There is nothing improper with the defendant sitting here throughout the trial.

MR. PUISZIS: I am not implying that, but *the only witness who is allowed to sit in a courtroom and hear all the other witnesses' testimony is him. That is how he is able to get his story down with his cousin, Eddie Johnson.*" (Emphasis added.)

This invidious rhetoric was improper. First, it was improper to argue what " defendants do," that "they deny committing the crimes," and that "they do not want to be convicted." (*People v. Starks* (1983), 116 Ill. App. 3d 384, 392, 451 N.E. 2d 1298.) Second, the defendant had the constitutional right to be present throughout every stage of his trial. The sixth amendment to the Constitution of the United States provides. "in all criminal prosecutions, the accused shall enjoy

the right *** to be confronted with the witnesses against him ***." It is provided in the fourteenth amendment to the United States Constitution, "No State shall *** deprive any person of life, liberty, or property without due process of law ***." Article 1, section 2, of the Illinois Constitution of 1970 similarly provides, "No person shall be deprived of life, liberty or property without due process of law ***." Section 8 article 1 of the Illinois Constitution provides, "In criminal prosecutions, the accused shall have the right to appear and defend in person and by counsel *** and *** to meet the witnesses face to face ***." It was horribly offensive for this errant advocate to argue to the jury that by the defendant's exercise of his constitutional right to be present during his trial, the defendant could "hear all the other witnesses' testimony," and was thereby " able to get his story down with his cousin" and fabricate his testimony. The Constitution prohibits the drawing of any sinister or unfavorable inference from the exercise of a constitutional right. In *People v. Davis* (1968), 39 Ill. 2d 325, 235 N.E. 2d 634, the supreme court allowed the defendant leave to appeal from the denial of his post-conviction petition which alleged that the defendant was tried *in absentia* in violation of his constitutional right to be present at every stage of the criminal proceeding against him. The defendant in *Davis* was admitted to bail and claimed that he did not receive notice of his trial date. He was tried and convicted *in absentia*. Reversing the appellate court, the supreme court held, "There is, of course, no question as to the defendant's absolute right to be present at his trial ***." (39 Ill. 2d 325, 329.) The court further stated:

" 'Since the Magna Carta, the law has shown a steadfast predisposition favoring the opportunity to be heard. Justification for this view is the theory that "the history of liberty has largely been the history [of observance] of procedural safeguards." ' " 39 Ill. 2d 325, 330-31.

In *People v. Evans* (1961), 21 Ill. 2d 403, 405-06, 172 N.E.2d 799, the supreme court reversed the defendant's conviction because he was not present during his trial. The court stated:

"For generations our law has shown an anxious concern lest any semblance of trial *in absentia* be sanctioned."

The framers of the constitution intended that a criminally accused defendant reap whatever benefit his presence during his trial might yield, including hearing the testimony of defense witnesses before he testifies. (U.S. const., amend. VI.) The Supreme Court so held in *Brooks v. Tennessee* (1972), 406 U.S. 605, 32 L. Ed. 2d 358, 92 S. Ct. 1891. In *Brooks*, the Tennessee legislature attempted to offset the ad-

vantage the defendant's presence at his trial afforded him and his concomitant ability to accordingly tailor his trial testimony. The Tennessee legislature enacted a statute which required a defendant in a criminal case who desired to testify, to do so before any other defense witness. The Supreme Court held that this statute violated the defendant's constitutional privilege against self-incrimination and that the defendant could not be penalized for remaining silent at the close of the State's case by being excluded from testifying later in his trial. (406 U.S. 605, 612-13, 32 L. Ed. 2d 358, 363-64, 92 S. Ct. 1891, 1895.) The court further held that this statute also denied the defendant due process in that it deprived the defendant of the guiding hand of counsel in deciding not only whether the defendant would testify but, if he did, at what stage of the trial proceedings. 406 U.S. 605, 612-13, 32 L. Ed. 2d 358, 363-64, 92 S. Ct. 1891, 1895.

If, in *Brooks*, the State statute which required a defendant to testify before the defense witnesses and which forbade a defendant from testifying subsequent to any defense witnesses violated the defendant's constitutional right against self-incrimination, due process and the right to counsel, *a fortiori*, in the case at bar, the prosecutor's adverse comments to the jury on the defendant's presence during his trial and the defendant's ability to thereby conform and fashion his testimony are also unconstitutional.

A defendant also has a statutory right to be present during his trial. Section 115—3(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 115—3(a)) provides, "A trial shall be conducted in the presence of the defendant unless he waives the right to be present."

Based on the foregoing legal authority, it is patently clear that the prosecutor's comments about the defendant's presence during his trial were most improper. Upon reviewing the complete record in this case, I am convinced that the prosecutor's arguments about which complaint is made were not inadvertently or spontaneously induced by a highly emotional trial atmosphere. Rather, the arguments were deliberate and calculated. As stated in *People v. Starks* (1983), 116 Ill. App. 3d 384, 395, 451 N.E.2d 1298, "Any improper argument that was not made *** would seem to have been omitted by inadvertence rather than by design ***." In the pending case, a graphic example of this statement was Assistant State's Attorney Puiszis' closing rebuttal argument, where he said:

> "Now, the Defense makes a big deal about [police officers] Newton and McGlynn. They are taking down notes differently. Well, something you have got to remember is you know *we*

*prosecutors and the Defense are bound by certain rules of evidence.* When we put on Mr. McGlynn, we can only limit him today, to certain matters to be brought out in impeachment. We can't—*we couldn't have McGlynn testify to the entire conversation—*

MR. SOPATA: Objection.

MR. PUISZIS: *—and Counsel knows that.*

MR. SOPATA: And counsel could have called him in his case in chief, if he wanted.

THE COURT: He could have called him in his case in chief. He did not. He called him as a rebuttal witness, and his testimony is limited for that purpose.

MR. PUISZIS: Thank you, your Honor.

\* \* \*

Another example here of how many times have you heard us, during closing arguments, say Judge, that's not what the evidence showed. And *we're sitting here taking notes. We're in the same position as Newton and McGlynn taking down notes, and they're taking down their notes. And Mr. Aprati wants to say Newton and McGlynn are lying because they're—*

MR. APRATI: Objection, Judge, that's not what I said.

THE COURT: The jury heard what you said, Mr. Aprati. Proceed, Mr. State's Attorney.

MR. PUISZIS: *Our notes and Mr. Aprati's notes don't jive* [*sic*] at all times during the portion of the trial. *Does that mean we're lying? No. What it tells you is that McGlynn and Newton* are human beings and they *come into court and they tell you the truth,* to the best of their ability." (Emphasis added.)

Here, Puiszis again improperly and repeatedly injected himself into the case in an attempt to enhance the credibility of his two police witnesses. Puiszis was not content with the improper tactics he used during his opening argument in an endeavor to unjustly improve the credibility of Tamara Clark and Audrey Wesley.

With government tyranny rampant throughout history and presently throughout the world, our courts must be zealously vigilant in requiring, indeed in demanding, that our government not violate the law or the constitutional rights of its citizens—the accused as well as the unaccused, the guilty as well as the innocent. Our courts must be steadfast and unyielding to the temptation to relax constitutional rights or to approve constitutional infringements in order to implement and insure the success of criminal prosecutions. In fact, as recently as April 1985, our supreme court in *People v. Brisbon* (1985),

106 Ill. 2d 342, vacated the death sentence because of the prosecutor's inflammatory jury argument during the death penalty hearing.

The renown jurist, Jerome N. Frank, eloquently denounced the prosecutor's impermissible closing argument in his landmark dissent in *United States v. Antonelli Fireworks Co.* (2d Cir. 1946), 155 F.2d 631, 661-63. Justice Frank's denunciation is as applicable today as it was 39 years ago when he wrote it. His protracted expressions on this point defy improvement:

> "[A] government lawyer acts unfairly when he arouses jury prejudices that are irrelevant and distracting.
>
> This court has several times used vigorous language in denouncing government counsel for such conduct as that of the United States Attorney here. But, each time, it has said that, nevertheless, it would not reverse. Such an attitude of helpless piety is, I think undesirable. *It means actual condonation of counsel's alleged offense, coupled with verbal disapprobation. If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it.* For otherwise it will be as if we declared in effect, 'Government attorneys, without fear of reversal, may say just about what they please in addressing juries, for our rules on the subject are pretend-rules. If prosecutors win verdicts as a result of "disapproved" remarks, we will not deprive them of their victories; we will merely go through the form of expressing displeasure. The deprecatory words we use in our opinions on such occasions are purely ceremonial.' Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of ritualistic verbal spanking. The practice of this court—recalling the bitter tear shed by the Walrus as he ate the oysters—breeds a deplorably cynical attitude towards the judiciary.
>
> On the other hand, a reversal in a case like this might well serve as a deterrent: If it became known that misconduct of a United States Attorney had caused the public the expense of a new trial, his resultant unpopularity might tend to make him subsequently live up to professional standards of courtroom decency. If this court really meant business about such behavior as that of government counsel in the case at bar, if it actually considered such behavior reprehensible, it would, at a minimum, announce that if, in any future case any government lawyer should thus conduct himself, it would deprive him of the right to practice in this court and would recommend that he be removed from his office as a representative of our government.

This is no light matter. In its Report on Lawlessness in Law Enforcement, the National Committee on Law Observance and Enforcement said, in 1931 \*\*\*: 'First, these unfair practices are a type of lawless enforcement of law which is especially liable to create resentment against law and government, because they are committed by district attorneys \*\*\* the very officials most definitely responsible for law observance. Moreover, these abuses usually occur in the publicity of a courtroom. They are not hidden away and subject to denial like the third degree. They are witnessed by spectators and may be recorded by the press, so that many members of the public may be revolted by the oppressive conduct of men chiefly responsible for the administration of justice. Such resentment easily engenders the dangerous feeling that a fair trial has been denied because the defendant belongs to an unpopular group and that for members of such a group justice through the courts is not to be expected \*\*\*. Not to be overlooked is the effect of unfairness upon the accused. Even if he is guilty there are degrees of criminality which he may not yet have reached. It may still be possible to accomplish his readjustment to society, but hardly so if he feels deeply and justly that society in the person of its chief representatives has behaved tyrannically and brutally. The natural effect of this motion is to alienate him still further from the community and make him regard his criminal associates as the only men who treat him decently. In consequence he may leave prison a bitter enemy of society, more willing than before to continue a criminal career. His resentment will be shared by his family and friends. The result of the unfairness upon these persons and upon the public will be a decrease in respect of law, which is a main factor in assuring its observance \*\*\*. *Thirdly, and perhaps most seriously, unfair practices may result in the conviction of the innocent.*'

*A legal system is not what it says, but what it does.*

\* \* \*

Lawyers may talk rhapsodically of JUSTICE. They may, in Bar Association meetings, hymn the pre-eminent virtues of 'our Lady of the Common Law,' prostrate themselves devotedly before the miracle of the common law's protection of human liberties. But, in the last analysis, there is only one practical way to test puddings: *If, again and again in concrete instances, courts unnecessarily take the chance of having innocent men sent to jail or put to death by the government because they have*

*been found guilty by juries persuaded by unfair appeals to improper prejudices, then the praises of our legal system will be but beautiful verbal garlands concealing ugly practices we have not the courage, or have grown too callous, to contemplate."* (Emphasis added.)

The defendant's judgment of conviction should be reversed and the cause should be remanded for a new trial.